Argued October 22, remanded for reconsideration November 29, 1976

COTTRELL et al, *Petitioners,*

*v.*

OREGON LIQUOR CONTROL COMMISSION,
*Respondent.*

(CA 6496)

556 P2d 982

*William B. Reisbick,* Milwaukie, argued the cause and filed the brief for petitioners.

*Al J. Laue,* Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and W. Michael Gillette, Solicitor General, Salem.

Before Schwab, Chief Judge, and Tanzer and Richardson, Judges.

TANZER, J.

## TANZER, J.

Petitioners are the owners and operators of the Blue Boar Inn, a restaurant and tavern in Pine Grove, 17 miles west of Maupin on Highway 216. It is presently licensed to sell retail malt beverages and the applicants applied to the Oregon Liquor Control Commission (OLCC) for a DA license to sell liquor by the drink. The OLCC denied the application and the applicants seek judicial review.

The OLCC concluded that a DA license was not demanded by the public interest for three basic reasons: (1) "the problems of police protection," (2) the limitations of the 1:2000 license-to-population quota, ORS 472.110(4),[1] and (3) "the design and facilities of the outlet" being more like a tavern than a restaurant. The applicants challenge each ground on several bases. We shall review each in turn.

### Problems of Police Protection

■ The Commission found as fact that the applicants' establishment was located on Highway 216 in a recreation area, and that about 60 percent of its trade is from tourists and recreationists in the area, the remainder coming from the population within 15 miles of the outlet. It also found that the nearest DA outlet is about 15 miles away in Maupin and the next one about 30 miles away. It further found:

"The outlet is located at a minimum of 20 minutes driving time from the nearest Deputy Sheriff. The area lacks regular police patrols, although law enforcement personnel will stop in once a week or so. The Wasco County Sheriff by letter stated he had no law enforcement problems at the Blue Boar Inn or with the applicants. A letter from a Wasco County judge supported the application, noting the distance of 10 miles to

---

[1] ORS 472.110(4) provides:

"The total number of licensed premises dispensing distilled liquor pursuant to this chapter shall not in the aggregate at any time exceed one such licensed premises for each 2,000 population in the state, determined according to the last available estimated quarterly State Board of Higher Education figures."

the nearest facilities and the desirability to the safety of traveling public of having a liquor dispensing facility near the residences of the local population, and that the applicants all had a good reputation and the facility would be operated with an emphasis on good order."

Based upon these findings of fact, the Commission came to the following ultimate findings of fact:

"Although the County Sheriff has no apparent objection to the license, the lack of regular police patrols and the duration of the minimum time span which must lapse before the arrival of a resident Deputy Sheriff both suggest a serious question as to the status of law enforcement at the outlet. The opinion of the County Judge as to the potential hazard to motorists from drinking drivers is relevant, but ignores the probability that increased availability of liquor will in fact increase the number of drinking drivers on the road; also, in his capacity as Judge, he may be familiar with law enforcement problems when they reach the point of formal accusation or trial, but probably cannot be aware of the day-to-day situations which exist and do not rise to the level where they come to his attention."[2]

These findings and ultimate findings found the Commission's conclusion that:

"Granting of the greater privilege to the subject outlet would have an adverse effect on law enforcement in the area [OAR Chapter 845 10-715(5)]."

The applicants contend that the evidence is contrary to the Commission's conclusion. The facts, however, are not in dispute. It is upon the inferences to be drawn from those facts that the dispute arises. In sum, the Commission found that due to the distances and locations, the sheriff would be unable to respond quickly to disturbance or traffic problems arising from a licensed outlet, whereas the applicants would infer that the availabaility of a nearby outlet would reduce the amount of driving by drinkers. Either inference is

---

[2]The characterization of the county judge as a judicial officer is erroneous. The make-weight nature of the observation, however, causes us to believe that the Commission would have arrived at the same ultimate finding of fact even were this error brought to its attention. We therefore ignore it.

reasonable. As we said in *McCann v. OLCC,* 27 Or App 487, 503, 556 P2d 973 (1976):

> "* * * *Home Plate*[3] does not require that we agree with the reasoning by which an agency draws inferences. * * * What *Home Plate* does require, however, is that an agency's reasoning be rational, that is not irrational, nonrational or fallacious. * * *"

Since the Commission has found facts and come to an inference based upon and rationally connected to those facts, the findings and ultimate findings are upheld even though contrary inferences might have been drawn from the same evidence.

## Quota and Public Demand

Under these assignments of error, the applicants claim (1) that the reliance by the Commission upon the "over-subscription" of Wasco County is unfair as applied to them, and (2) that the reliance by the Commission upon the monthly food sales by applicants was arbitrary in the absence of written standards for food sales. These seemingly distinct decisional factors are related in the Commission's order. Essentially, the quota is used as a numerical standard against which to judge the sufficiency of demand, as evidenced by geography, population and food sales.

As to the quota, the Commission found that the population of Wasco County is 20,050, which would suggest ten DA licenses on a strict ratio basis, whereas there are actually 17 such licenses operating within the county. It also found that there were 18 DA licenses available for distribution in the entire state.

It also found, as noted above, that numerous recreationists use the area and that they and tourists comprise some 60 percent of the trade of the applicants. It further found that about 100 families, or 300 persons, reside within a 15-mile radius of the applicants' premises and that another 40 or 50 are employed nearby. The closest DA outlet is about 15

---

[3] *Home Plate, Inc. v. OLCC,* 20 Or App 188, 530 P2d 862 (1975).

miles away and the next closest about 30 miles away. It further noted that applicants' recent monthly gross sales range from $2,207 to $4,259, about half of which constitute food sales. Based upon these findings, the Commission made these ultimate findings of fact:

"While the distance to other licensed premises is indeed relevant, as 17 miles is not an insignificant distance, it cannot be an important factor due to the small number of persons which the outlet serves. The permanent population of the area is very small and even if all the seasonal hunters and recreationists that applicant states are in the area who are merely transient were included, the number is still fewer than 1,500. The food sales figures also indicate that there is not a significant demand served, either from local residents or from transients; the largest monthly figure is $2,000 for June; and if the cost of the average meal is as low as $2.00 (as stated by applicant), then only about 1000 people were served. A far larger demand must be demonstrated in order to justify issuance of one of the 18 Dispenser Licenses available."

Thereupon, the Commission made the following conclusions of law:

"The statutory quota of ORS 472.110(4) is one Dispenser-type license per 2000 population statewide. Although it does not by its terms apply to a more local level, it does place a limitation on the number of Dispenser licenses available at any one time. Therefore, in order to ensure that the citizens of every part of the state have an equal opportunity to be served by such licenses, it is necessary, so far as other factors such as numbers of transients allow, to apportion these licenses in accordance with the distribution of population within the state. If any given area has greater than the number of Dispenser licenses determined by application of the one to 2000 statutory ratio to the population of that area, then necessarily there would be more licenses per person and conversely fewer persons served per license than an area with fewer than the number of licenses so determined. All else equal, such as number of non-residents reflected in sales figures, a greater number of the citizens of the state would be served by denial of Dispenser licenses in areas of 'over-subscription' and

[ 530 ]

granting of such of the limited numbers of licenses as are available to 'under-subscribed' areas. Wasco County is 'over-subscribed'. There is only a small amount of demand demonstrated at the subject outlet, thus indicating that even though transients consitute 60% of its trade, they do not appreciably alter the situation indicated by the population figures.

"Therefore, granting of a Dispenser license to the Blue Boar Inn would not be a prudent use of the 18 remaining licenses that may issue under the quota, nor would it be a judicious allocation of a Dispenser license in terms of geographic distribution. [ORS 472.110(4)] [OAR Chapter 845 10-715(10)]"

■ The one license per 2,000 population quota and the availability pursuant to that ratio of only 18 licenses for the entire state, *Battle Creek Golf Course v. OLCC,* 21 Or App 179, 534 P2d 204 (1975), is a constraint which necessarily influences the strictness or liberality with which the OLCC applies other decisional factors. Thus it was properly taken into consideration in the formulation of the Commission's conclusions of law. Evidence of the residential and transient population in the general area indicated a potential population catchment of less than 2,000 in the "trading community"[4] of the applicants' premises at any given time. This was appropriate evidence of insufficient demand to justify the denial of a license within this trading community under the constraints of the statutory quota.

■ Applicants contend that the use of food sales figures is improper because there is no standard or criteria regarding amount of food sales adopted pursuant to *Sun Ray Dairy v. OLCC,* 16 Or App 63, 517 P2d 289 (1973). In this case, however, the amount of food sales was not used as a standard in itself. It was properly considered as evidence of the amount of demand within the trading community. In this respect

---

[4] Among the criteria established pursuant to *Sun Ray Dairy v. OLCC,* 16 Or App 63, 517 P2d 289 (1973), found in OAR ch 845, 10-715, is "(1) The availability, comparability and community acceptance of other liquor outlets within the trading community of the subject liquor outlet."

it is distinguishable from the use of food sales figures in *McCann v. OLCC*, supra, as the basis for a fallacious comparison with neighboring outlets. The determination of a trading community is not an exact process, but here, unlike in *McCann,* the Commission looked to the general sources of patronage of the food and drink outlet, and that evidence may properly be found to indicate insufficient demand in light of the quota.

■ The applicants further complain that the reliance upon the "over-subscription" in Wasco County is unfair because most of the licenses are in The Dalles, whereas the rural area is not so heavily subscribed. The area, population and sales figures support the conclusion that the grant of a license was not justified under the statewide 1:2000 ratio. The Commission looked to the number of licenses within Wasco County only for its general relationship to its objective "to ensure that the citizens of every part of the state have an equal opportunity to be served by such licenses."[5] Thus the subscription level in Wasco County bore a rational relationship to a valid policy objective.

Again, the inferences are in dispute, but not the facts from which those inferences flow. It is for the agency, not this court, to choose from among available inferences. We hold that the Commission's conclusions regarding public demand and the quota are supportable in this record and should not be set aside.

### Design and Facilities of the Outlet

Applicants challenge the conclusion that their establishment is more in the nature of a tavern than a restaurant because the OLCC rules provide no standard for that decision. Even if the rules are adequate, however, applicants claim that there is no evidence to support such a determination.

---

[5]There is not in this case a record of the historical pattern of over-subscription which amounts to policy as in *McCann v. OLCC,* 27 Or App 487, 556 P2d 973 (1976). Also, in *McCann* there was no such policy-related reasoning expressed in the order.

The applicants testified that the premises, as recently remodeled, has a tavern area of about 1,200 square feet and a restaurant area of equal size. Photographs confirm the testimony.

The "atmosphere" ground was raised for the first time at the hearing. The assistant director of licensing for the OLCC testified that two pool tables and a jukebox in the tavern area gave the establishment a "tavern atmosphere," that he was unaware of any plan to remove these "accoutrements" and that the "general overall tone of the premises" was not what would normally be considered characteristic of a Class A outlet. He also testified that there were no written requirements regarding decor, games or music, but that he was making a subjective judgment that the outlet was designed to attract beverage rather than food consumers. He also acknowledged that some existing DA outlets had pool tables and jukeboxes.

From that evidence, the Commission found:

"9. As indicated by photographs of the interior, the tavern portion of the premises has a juke box and pool tables. The facility is newly remodeled; and in addition the tavern has a well-decorated dining area and sanitary and adequate cooking facilities.

"10. A DA license may be issued to railroad corporations operating interstate trains and to commercial establishments where food is cooked and served [ORS 472.110(2)]. Each DA outlet maintains food sales equivalent to 25% of its gross volume over any 60-day period [OAR Chapter 845, Rule 10-185(2)]. A DA license, then, should issue to an outlet which is in fact a bona fide restaurant."

Upon those findings the Commission came to the following ultimate finding of fact

"The design and facilities of a significant part of the outlet are those characteristic of a tavern rather than a DA outlet; pool tables and a juke box are not facilities normally associated with a bona fide restaurant."

and conclusion of law:

"The design and facilities of the outlet are those of a tavern, not a restaurant. [OAR Chapter 845 10-720(3)]."

[ 533 ]

The atmosphere of an eating and drinking establishment is not easy to describe. A Robert Service, Ernest Hemingway, or even Arlo Guthrie may do so, but such powers of articulation are not demanded of administrative agencies and judicial bodies. There are subjective considerations which are not easily articulated and the variety of possibilities defies specificity.

We noted in *McCann v. OLCC, supra,* from a review of the case law, that we do not require mathematical precision in the statement of predecisional criteria where, due to the existence of many variables, standards cannot be precisely defined in advance of their application. In that situation, the statement of criteria may be a general declaration of "the broad bases upon which decisions regarding issuances of liquor licenses will be made," *Sun Ray Dairy v. OLCC,* 16 Or App 63, 74, 517 P2d 289 (1973), if the criteria are related to a statutory purpose of the agency. As we stated in *Sun Ray, supra,* 16 Or App at 72:

> "The parties to a hearing of a contested case must know what is to be heard in the hearing. The agency and the applicant are entitled to know what they are required to prove and disprove in order to gather and present their evidence. * * *"

The individual decision must reflect the facts found pursuant to the particular criterion and it must relate those facts rationally to the conclusion. *Home Plate, Inc. v. OLCC,* 20 Or App 188, 530 P2d 862 (1975).

In this case the challenged criterion is OAR Chapter 845, 10-720(3), which provides:

> "Enterprise criteria to be considered are:
> "* * * * *
>
> "(3) The size, design, facilities and decor of the subject liquor outlet.
> "* * * * *."

The regulation itself provides no guidance for application. Any given "size," for example, may be too small for one purpose, too large for another, and just right for yet another. No evaluation based upon the criteria

of "size, design, facilities and decor" can be made without resort to the purpose which is to be achieved by the application of such general criteria. For that purpose, we may look to rule or to statute.

Here we are referred to and we find no purpose expressed in statute or regulation which would indicate to the applicants, to the agency or to a reviewing court that the atmosphere of the outlet was inconsistent with the Commission's expectations for DA licensed premises. The rules refer to the statutory purpose "to prevent abuses associated with saloons or resorts for the consumption of distilled alcoholic liquors," ORS 472.030, but that reference is general and hortative rather than informative of specific purpose.

There is nothing in the statutory grounds for denial which would sustain this application of the criteria. ORS 472.160.

ORS 472.110 provides for DA licenses in "commercial establishments where food is cooked and served," but goes on to provide that the licensees may "allow dancing and * * * other proper forms of entertainment," which would lead the applicants to conclude that there is no problem with having two pool tables and a jukebox in the tavern portion of their premises.

The order refers to the regulatory requirement that DA licensees must maintain food sales of at least 25 percent of gross sales, but the applicants presently derive about half of their revenue from food sales and their future performance can be quantified in reports to the Commission.

In sum, in the absence of a controlling statute or rule, the applicants had no way to anticipate that the atmosphere of their establishment would be in issue at the hearing and were unable to gather their own evidence or test that of the Commission on this issue. Further, even making allowance for the subjective quality of this issue, the evidence was general and

conclusory in nature. For both of these reasons, this ground of the order denying the license application cannot be sustained on review.

## Conclusion

Applicants ask that we order the issuance of a DA license if we have cause to set aside the order. The authority to deny DA licenses is given by statute to the OLCC, ORS 472.060(2), not to the courts. Since some of the Commission's reasons are valid and since ORS 472.160 authorizes the Commission to deny a DA license based upon any one of its subsections, we remand the order to the OLCC for reconsideration.

Other matters raised by applicants are of less than decisional magnitude or have been dealt with in prior decisions.

Remanded.