Argued August 26, reversed and remanded November 29, 1976,
reconsideration denied January 5, petition for review denied
February 1, 1977

McCANN et al, *Petitioners,*

*v.*

OREGON LIQUOR CONTROL COMMISSION,
*Respondent.*
(CA 6035)
556 P2d 973

*Walter L. Crow, Jr.,* Beaverton, argued the cause and filed the brief for petitioners.

*Al J. Laue,* Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and W. Michael Gillette, Solicitor General, Salem.

Before Schwab, Chief Judge, and Thornton and Tanzer, Judges.

TANZER, J.

## TANZER, J.

Petitioners seek judicial review of an administrative order of the Oregon Liquor Control Commission (OLCC) denying them a Dispenser Class "A" (DA) license for their restaurant, the Mexico City Dinner House. Petitioners appealed an administrative rejection of their application. The hearings officer recommended approval. The Commission denied the license based upon a finding that one of the applicants, Robert Rueda, "is not of good repute and moral character" and that the issuance of the license is not demanded by the public interest.

Petitioners assert that the finding regarding petitioner Rueda is erroneous because it is based upon the admission into evidence over petitioners' hearsay objection of a letter from the California liquor authorities regarding alleged violations of California liquor control laws and regulations while licensed in that state. Petitioners further claim that that conclusion and the conclusion regarding public demand are unsupported by substantial evidence or are otherwise erroneously arrived at.

The document challenged as hearsay is a letter from the State of California Department of Alcoholic Beverage Control to the OLCC regarding Robert Rueda dated February 17, 1970. It includes a list of licenses granted to premises in which Rueda had an ownership interest. It then sets out the following:

"RECORD OF DISCIPLINARY ACTION

"127 E. Market, dba Owl Billiards, while licensed with On Sale General Eating Place License; sale to a minor (Viol Sec. 25658a&b of ABC Act, accusation filed 7-10-56, Reg. #4225, dismissed as minor purchaser, a Mexican National and unavailable to testify).

"127 E. Market Street, dba El Tecolote, while licensed with On Sale General Public Premises License; Viol of Sec. 25656 of ABC Act (Using services of female bartender—Misdemeanor), Viol Sec. 24200(a) ABC Act (Continuance of a license would be contrary to public welfare and morals) Viol of Rule 143 of ABC Act

[ 489 ]

(Female employees of On-Sale Licensees Soliciting or Accepting Alcoholic Drinks), Viol Sec. 135 California Penal Code (Destroying Evidence—re employee destroyed evidence — glass containing brandy and water), and Viol of Sec. 148 California Penal Code (Resisting public officers in the discharge of their duties). Fifty three counts involving all above violations which occurred between 2-11-64 and 2-25-65 were filed in an accusation dated 4-8-65, Reg. #6060; penalty—45 day suspension effective 8-19-65 and indefinitely thereafter to permit transfer to other qualified persons at another location. * * *"

The hearing referee overruled the objection to the exhibit on the ground that, although hearsay, it was reliable. The Commission acknowledges that the document is hearsay.

ORS 183.450(1) provided that the "rules of evidence as applied in equity cases in the circuit courts of this state shall be followed" in administrative hearings. The administrative rules of the OLCC also provide that equity rules of evidence shall be applied. Oregon Administrative Rules, ch 845, § 10-520. Therefore the exhibit should have been excluded as hearsay and its admission was prejudicial.

Since this matter must be remanded and the rule may be amended,[1] it is appropriate to consider petitioners' alternative assertion that the letter, even if properly admitted, does not constitute substantial evidence to support the Commission's ultimate finding of fact that

"* * * [t]he foregoing indicates that he [Rueda] does not have good moral character and is not of good repute and that such conduct may continue in Oregon."

and the Commission's conclusion that

"[a]pplicant Robert Rueda's past history of liquor violations in California is a reasonable ground for

---

[1]The 1975 Legislative Assembly amended ORS 183.450 to provide that "[a]ll other evidence of a type commonly relied upon by reasonably prudent persons in the conduct of their serious affairs shall be admissible." OR Laws 1975, ch 759, § 12.

[ 490 ]

believing that such applicant is not of good repute and moral character * * *."

The 1956 accusation of violation was dismissed and, standing alone, it is therefore proof of nothing. The 1964-65 violations are more substantial. We cannot in 1976 say that the employment of a female bartender reflects badly upon the employer's character or repute. Other violations referred to conduct by employes. A series of violations based on female employes soliciting, other than as a bartender, or accepting drinks could well relate to the character of the proprietor, but the report does not tell us whether there was one such violation or fifty. While the nature of the charges in this case may reflect upon management ability, there is nothing in the record to indicate that Mr. Rueda was so involved by conduct or scienter as to justify an inference as to his character or repute.

■ The discrepancy between evidence and conclusion may flow in part from the controlling statute. ORS 472.160 provides:

"The commission may refuse any applicant if it has reasonable ground to believe:
"* * * * *

"(7) That the applicant has been convicted of violating any of the alcoholic liquor laws of this state, general or local, including provisions of this chapter, or has been convicted at any time of a felony.
"* * * * *

"(9) That the applicant is not of good repute and moral character.
"* * * * *."

The authorization under subsection (7) of denial for violation of Oregon liquor laws, implies that violation of the liquor laws of other states is not sufficient in itself to justify a denial. Violations of regulations may by their number or nature reflect upon moral character as that term is used in ORS 472.160, but the evidence here is insufficient to support a finding. Proof of bad character based on foreign law violations

[ 491 ]

or their underlying circumstances must involve violations of a nature or number sufficient to show turpitude or disregard for law; that is, the evidence must be specifically relevant to the issue of good character or some other statutory ground. The subject of repute is not posed and we do not deal with it.

All other evidence relevant to character and repute was favorable to the applicants. They operated a Mexican restaurant in Portland under a service permit allowing them to serve liquor to their patrons from an adjacent lounge with a DA license. During that period, none of the petitioners have received a notice of violation of liquor control laws or regulations. The City of Portland expressed its approval for the grant of the license at the time of the original application for a beer and wine permit. The Portland Bureau of Police reported "[n]othing of a derogatory nature was found concerning the applicants during the course of this investigation" and gave a favorable recommendation.

Therefore, the evidence in this case falls far short of the evidence of intentional and fraudulent violation of occupation-related law which we found in *Campbell v. Bd: of Medical Exam.,* 16 Or App 381, 393, 518 P2d 1042, *rev den* (1974), to be sufficient to bar the establishment of good moral character. There was an absence of substantial evidence to support the denial of a license on the basis of ORS 472.160(9) relating to good character and repute.

Petitioners next challenge the remaining grounds upon which their application was denied, that licensure is not demanded by public interest or convenience, contending, among other grounds, that the reasons were unsupported by substantial evidence.

This case presents an opportunity for review of the body of decisional law which we have developed, case by case, over the past few years, and how the principles we have adopted apply. We have held that the Administrative Procedures Act, ORS ch 183, requires that administrative agencies operating under broad

grants of power establish standards for official action for the purpose, among others, of consistency of application. One reason for that requirement, we observed in *Sun Ray Dairy v. OLCC,* 16 Or App 63, 71, 517 P2d 289 (1973) (*Sun Ray* I), is that an applicant is "entitled to even treatment by rule of law and reasonable confidence that he has received such treatment." *See also Graham v. OLCC,* 25 Or App 759, 763, 551 P2d 112, *rev den* (1976) (*Graham* II) (dissent of Thornton, J.)

Absolute consistency cannot be expected of an agency with as broad a delegation and complex a task as the OLCC, but procedures should work toward that end. Thus we recognized in *Sun Ray Drive-In Dairy v. OLCC,* 20 Or App 91, 95, 530 P2d 887 (1975) (*Sun Ray* II), that where standards cannot by their nature be precisely defined in advance of their application, the "Commission must have certain latitude in applying these criteria to conflicting interests." So many variables exist, that we have declined to require mathematical precision, so long as the agency provides notice to applicants and others of the criteria upon which what are often judgment calls are to be made and we have declined to review the Oregon Liquor Control Commission's decisions for mere disagreement with the manner in which criteria were applied. *Graham v. OLCC,* 25 Or App 759, 551 P2d 112, *rev den* (1976) (*Graham* II).

Where the adoption of precise pre-decisional criteria would be unfeasible, we have required instead that an agency demonstrate in its order a rational relationship between the facts and the legal conclusions upon which it acts in each case. As we stated in *Home Plate, Inc. v. OLCC,* 20 Or App 188, 190-191, 530 P2d 862 (1975):

> "If there is to be any meaningful judicial scrutiny of the activities of an administrative agency—not for the purpose of substituting judicial judgment for administrative judgment but for the purpose of requiring the administrative agency to demonstrate that it has applied

the criteria prescribed by statute and by its own regulations and has not acted arbitrarily or on an ad hoc basis—we must require that its order clearly and precisely state what it found to be the facts and fully explain why those facts lead it to the decision it makes. Brevity is not always a virtue. The less circumscribed an agency is by the legislative grant of power to it and by its own regulations augmenting that grant, the more detailed and precise its explanation of its actions exercising the powers granted to it must be. Few, if any, Oregon agencies operate under statutes or regulations that are less specific than those governing the Oregon Liquor Control Commission."

Accordingly, in *Home Plate,* the Commission's finding that five licensees existed within 36 blocks of the applicant's premises was not explicitly and rationally connected with its conclusion that another license was not demanded by public interest and convenience. In *Battle Creek Golf Course v. OLCC,* 21 Or App 179, 534 P2d 204 (1975) (*Battle Creek* II), we made clear that mere counting and measuring was not a substitute for the reasoning required in *Home Plate.* We held in *Battle Creek* II that a recital of the amount of population, the gross food sales of the applicant and the number of other licensees within a specific radius was not, without a rational explanation, sufficient to justify a conclusion that the granting of a license was "not demanded by public interest or convenience." A recital of evidence without rational nexus to the conclusion is insufficient. *Graham v. OLCC,* 20 Or App 97, 530 P2d 858 (1975) (*Graham* I).

The requirements of *Home Plate* are neither unrealistic nor unworkably stringent. In *Tierney v. Duris, Pay Less Properties,* 21 Or App 613, 624-25, 536 P2d 435, *rev den* (1975), we held in the context of zoning law, a field of at least equal complexity and subjectiveness, that the requirements of *Home Plate* could be and were met.[2]

---

[2] *Tierney v. Duris, Pay Less Properties,* 21 Or App 613, 624-25, 536 P2d 435, *rev den* (1975):

■ We recognized in *Home Plate, Battle Creek* II and *Tierney,* the difficulty inherent in articulating or systematizing what are sometimes subjective decisions based upon an array of considerations which may not lend themselves to meaningful weighting. Therefore, where decisional factors cannot be set out precisely beforehand, but are set out instead as general criteria, we look to the decision itself for a rational exposition of the facts and the reasoning which leads from the facts to the conclusion. Implicit in those cases is the expectation that we may disagree with the agency's inferences and conclusions, but that we will not overturn them so long as the reasoning is rational, not fallacious. In a sense, *Home Plate* added a *substantial reason* rule to the *substantial evidence* rule.

This case presents for review the attempt of the OLCC to apply that developing body of case law to the elusive concepts of demand and competition within undefined geographical areas as it is required by statute to do.

■ The statutory authority for denial of licenses arises from ORS 472.160 which provides in part:

"The commission may refuse any applicant if it has reasonable grounds to believe:

"(1) That there are sufficient licensed premises in the locality set out in the application, or that the granting of a license in the locality set out in the

"Nor can we agree that the June 19 and September 18 findings in support of the plan change are 'mere generalizations.' In *Home Plate, Inc. v. OLCC* 20 Or App 188, 530 P2d 862 (1975), we stated that administrative findings of fact should indicate what were found to be the facts and why those facts led the agency to the decision it made. Here the city council indicated what were found to be the facts—the proposed use would concentrate commercial development rather than create strip development, would replace deteriorating existing uses, and would provide goods and services needed in the neighborhood. And the council indicated those facts persuaded it that the advantages of concentrated commercial development, etc., outweighed the disadvantages of extending commercial development into a previously residential area. The plan-change findings were sufficient."

application is not demanded by public interest or convenience.

"\* \* \* \* \*"

The regulation implementing that statutory authority appears among the criteria for licensure apparently adopted pursuant to the requirements of *Sun Ray* I. Oregon Administrative Rules, ch 845, § 10-715 provides in part:

"Community criteria to be considered are:

"(1) The availability, comparability and community acceptance of other liquor outlets within the trading community of the subject liquor outlet.

"\* \* \* \* \*"

The commission has transformed the undefined statutory term, "locality set out in the application," into a concept more capable of application in the implementation of the statutory purpose, "trading community." On the face of it, defining "locality" in terms of a pattern of commerce appears to be a reasonable interpretation of statutory purpose, and we have no reason in this case to disapprove it. It is not further defined in the rule. We next examine the record in this case to see if the facts, reasoning and conclusions applying that regulatory concept in this case are supportable.

The "trading community" within which the Commission assessed public demand in this case was the area within an 18-block radius of the applicants' premises. The evidence in support of that determination is scant.

■ The statutory quota of one DA license per 2,000 population,[3] is a statewide constraint. Application of a

---

[3] ORS 472.110(4) provides:

"The total number of licensed premises dispensing distilled liquor pursuant to this chapter shall not in the aggregate at any time exceed one such licensed premises for each 2,000 population in the state, determined according to the last available estimated quarterly State Board of Higher Education figures."

The Commission regards the quota as a criterion, but it is actually a constraint. It is a limitation on, rather than a reason for, the exercise of discretion.

ratio to any lesser area is a regulatory act. For example, hypothetically, the Commission might rule that licenses are to be spread evenly throughout the state, or, alternatively, it might rule that a heavier concentration of licenses would be appropriate in areas with special characteristics, such as the Oregon coast with its heavy tourism, and that the heavier concentration would necessarily be compensated for by lesser concentration of licenses elsewhere. In the absence of statutory direction, the application of the statewide ratio within the state is a policy function within the discretion of the agency.

■ The Commission looks in this case and generally to the city of Portland as a lesser area for consideration. It found:

"* * * * *

"(8) At the time this application was investigated, there were 250 Dispenser outlets licensed in Portland. Portland's population at that time was 372,000, so that if the one per 2,000 population statutory quota for Dispenser licenses were to be applied to Portland, the ratable quota would be 186.10.

"(9) The Commission applies a ratable quota of Dispenser licenses to a geographical unit or political subdivision of Oregon as a guide to or indication of saturation of Dispenser outlets in a particular area.

"* * * * *."

The Commission concluded that the license was not demanded by the public interest because of, in part, "the apparent over-subscription of DA licenses in Portland as indicated by the ratable quota, and the necessity for a rational allocation of the limited number of Dispenser outlets."

The evidence, however, is that Portland has continuously had an "over-subscription" for at least the eight years immediately preceding the hearing for

which records are provided.[4] The Commission's data also shows that during the pendency of these administrative proceedings, there was a net increase of eight licenses in Portland, thus continuing the consistent growth pattern of the preceding eight years.

When a deviation from a norm is maintained by official decisions over an extended period of time, it ceases being a deviation and becomes the norm. A condition which is created, tolerated and enlarged by numerous deliberate decisions is not an aberration. It is clear from the record that the so-called "oversubscription" in Portland has become by repeated official decisions and continuous practice, the policy of the OLCC. That policy may well be reasonable given the particular nature of that city. However, the larger ratio cannot rationally be applied both as a silent policy for the benefit of some applicants who receive licenses above the number justified solely by population, and, in other cases, as a deviation from policy for which to deny other applicants.

---

[4]The Commission's data is as follows:

| Date | Quota by Population | Licenses Approved and in Operation |
|---|---|---|
| February 1, 1968 | 192.86 | 217 |
| May 1, 1968 | 192.12 | 221 |
| July 31, 1968 | 192.12 | 226 |
| March 1, 1969 | 188.90 | 223 |
| April, 1970 | 189.21 | 225 |
| October 1, 1970 | 189.21 | 230 |
| February 1, 1971 | 191.31 | 231 |
| February 1, 1972 | 191.50 | 234 |
| April 15, 1972 | 191.50 | 237 |
| May 15, 1972 | 191.50 | 237 |
| June, 1973 | 192.00 | 243 |
| November 13, 1973 | 192.40 | 243 |
| February 19, 1974 | 192.81 | 251 |
| July 15, 1974 | 192.81 | 245 |
| October 29, 1974 | 192.81 | 247 |
| March 13, 1975 | 186.10 | 248 |
| March 25, 1975 | 186.10 | 248 |
| April 23, 1975 | 186.10 | 250 |
| August 19, 1975 | 186.10 | 252 |
| September 23, 1975 | 186.10 | 255 |
| October 23, 1975 | 186.10 | 257 |
| November 20, 1975 | 186.10 | 257 |
| December 18, 1975 | 187.50 | 258 |

Therefore, the evidence does not support a conclusion that Portland is over-subscribed in relation to the quota which the Commission applies as a matter of actual policy to Portland. The Commission may rely on optimum subscription level as an indication of saturation, but the optimum must be based on fact and practice so as to provide a standard of guideline which is equally applicable to all applicants in that area.

In any event, the city of Portland might have been, but was not the "trading community" within which the Commission assessed public demand. The Commission looked instead to a smaller area, the 18-block radius surrounding the applicants' premises. The sole support for that designation is found in the Conclusions of Law:

"* * * * *

"(2) Applicants' proposed premises is located within easy driving distance of four DA outlets [within 18 blocks of applicants' premises] which presently adequately serve the demand existing in the trading community.

"* * * * *."

The evidence contradicts the reasoning and fails to support the designation. All of the Commission's witnesses from its investigative and licensing staff testified that the Mexico City Dinner House draws very little of its patronage from the neighborhood and that, because of its specialized cuisine, most of its customers come by automobile from the general Portland area. The applicants' testimony and petition for a license signed by over 500 customers confirm the observations of the Commission staff. There is no evidence that supports the inherent conclusion that the applicants and the four nearby outlets draw upon the same neighborhood patronage comprising a trading community. The only testimony on the facts or reasoning behind that determination of an 18-block radius trading community is by the OLCC investigating officer:

"Q   And let me ask you, how do you determine what area encompasses the trade community?

"A   You're speaking of what draws the—

"Q   Well, how do you determine what establishments to include in the nearest outlets?

"A   The ones that are the closest and that are DA Dispenser license.

"Q   O.K., you've got number five, the Peppermill. Excuse me, you've got Kay's Restaurant, 18 blocks, which is over a mile, a mile and six blocks, a mile and a half. Is there some type of a circumference from the applicant's restaurant that you use to—

"A   I use that determination by the convenience that he's talking about, and the convenience to other premises, how easy it is to get to that premises related to how they get to his premises and how the safety-wise is and all the other relations to it. In other words, the other Dispenser outlets, how in relation to his location, the center, his is the center and these are points, and all customers that would normally go to this could branch out easier to these others.

"Q   But don't you have a guideline as far as distance?

"A   No, we have safety-wise, and this is what I was taking. The guideline is population, period. We don't have any guidelines.

"Q   Well, here you selected one DA a mile and half away.

"A   Two.

"Q   Well, two, O.K. Two, a mile and a half away. Conceivably there are more Dispensers two miles away, three miles away.

"A   There's also some closer than a mile and a half. There's more closer up towards the east part of town than it is to these, but I'm speaking of the main thoroughfare, since they're using McLoughlin as a point of center, and then you have his premises. What places would these people go to if this place did not exist, and mainly it would be these places here.

"Q   How do you know that?

"A   This is what I take into consideration, the main traffic, the main road that leads to these places.

"Q   You're telling us that if Mexico City Dinner House did not sell beer and wine, did not sell liquor, hard liquor, that the people in this trading community, is that the term you use, trading community?

"A  Trading community, yes.

"Q  That they would go to one of these other Dispensers that you've enumerated, and my question is how do [you] know that? Isn't that an assumption?

"A  That's not what I'm saying. I'm saying that this place has no DA license, and these places have DA licenses, most likely they would go to these places over this one, because of the safety aspect, and that these are more . . . His place, as far as I'm concerned, is a good restaurant. I'm not saying that it isn't.

"Q  Well, I don't want to get into a safety aspect right now, and it's my understanding that your testimony was that irrespective of safety, the safety question, and concentrating solely on the question of whether or not there are sufficient licensed premises in this trading area, that if the Mexico City Dinner House did not have a Class A Dispensers license, that people in the trading community that might have otherwise gone here, have adequate other places in the trading community to go to. That's your testimony, as I understand it?

"A  Right.

"Q  And my question is: How do you know they'd go to these other outlets in the trading community? Have you run a survey or have you questioned?

"A  No, I —

"Q  Or is this just an assumption?

"A  It's just an assumption."

■ The problem is not in the adoption of the phrase "trading community," for it seems to be a reasonable concept. Nor is it in the failure to adopt mathematical standards for the application of the concept, for that would be impossible. The problem is in the failure to define "trading community" in terms which inform the OLCC staff, the applicants and others of the purposes to be achieved in the application of the concept to varying fact situations. Here, the investigator, counting and measuring as well as he could within a policy semi-vacuum, acted on an implicit assumption that a trading community is an 18-block radius neighborhood, but the applicants assumed, at least equally reasonably, that a trading community includes that area of the market place from which restaurants draw

most of their patronage. The Commission is free to adopt that policy or any other which reasonably advances the legislative purposes, but it must do so explicitly so that it can be applied evenly by staff, applicants, judicial reviewers and all other interested parties. *Sun Ray* I, 16 Or App at 70. Adoption of "trading community" as a standard or criterion may be a proper beginning, but is insufficient to accomplish that end. This remand will give the Commission opportunity to consider the concept in greater depth in light of its experience.

■ Finally, we examine the conclusion that there are sufficient outlets within the 18-block radius to satisfy public demand. Here, the reasoning of the Commission is contradictory and hence fallacious. It found that there were four DA licensees with varying average monthly food sales near the applicants.

| Name | Distance | Average Monthly Food Sales |
|------|----------|----------------------------|
| Semaphore Cafe | 6 blocks northwest | $11,065 |
| Rose Manor Inn | 6 blocks northwest | $24,661 |
| Kay's Cafe & Lounge | 18 blocks southwest | $ 8,000 |
| Peppermill Inn | 17 blocks southwest | $ 3,100 |

Applicants' average monthly food sales are $8,472 over the preceding 13 months from January, 1975, through January, 1976.

The conclusion of non-demand is related to the facts by these reasons taken from the Ultimate Findings of Fact:

1. Applicants' average monthly food sales do not demonstrate "a significant public demand for a DA license at this location" because they are lower than the combined average of the four nearby outlets.

2. "* * * The fact that two of the outlets average only $3,100.00 a month and $8,000.00 a month, respectively, indicates that public demand is being adequately served in the area, as the presence of greater public demand would at least partially be

[ 502 ]

reflected in higher food sales at those outlets, increasing to the levels of the remaining two outlets."[5]

The rationale of *Home Plate* is instructive as we examine this record in its light. *Home Plate* does not require that we agree with the reasoning by which an agency draws inferences. Thus, a court might infer upon review that a restaurant without a DA license which sells more food than two nearby restaurants with DA licenses, does so because of the quality of the food, service or environment, rather than the amount of neighborhood demand for liquor by the drink, but the Commission is free to reasonably infer otherwise. What *Home Plate* does require, however, is that an agency's reasoning be rational, that is not irrational, nonrational or fallacious. Here the Commission's reasoning is contradictory and thus fallacious.

The Commission reasoned that the applicants' license is not demanded by public convenience because (1) they sell less food than the average of the four nearby outlets, and also because (2) they sell more food than the two farthest outlets. We do not see that those two reasons can be logically reconciled. Further, the Commission ignores the necessary converse of (2), that public demand in the applicants' area is not satisfied because the two nearest outlets have higher food sales.

Therefore, while the Commission has set out its data and conclusions in a syllogistic framework in formal compliance with ORS 183.470, the nexus between facts and conclusions is not rational and the order cannot be sustained under *Home Plate, Battle Creek* II and *Graham* I.

For all of the above reasons, the order of the Commission denying a DA license to the applicants must be set aside.

Reversed and remanded.

---

[5] Other reasons advanced by the Oregon Liquor Control Commission staff testimony at the hearing were not incorporated into the Commission's order and therefore are not presented for review.