Argued July 25, reversed and remanded August 1, 1978

# COMMONWEALTH PROPERTIES, INC., *Respondent,*

*v.*

# WASHINGTON COUNTY et al, *Appellants.*

## (No. 36-102, CA 7031)

### 582 P2d 1384

Gregory S. Hathaway, Assistant County Counsel for Washington County, Hillsboro, argued the cause for appellants.

James H. Clarke, Portland, argued the cause for respondent. With him on the brief were John Wiley Gould, and Dezendorf, Spears, Lubersky & Campbell, Portland.

Before Schwab, Chief Judge, and Thornton and Tanzer, Judges.

SCHWAB, C. J.

## SCHWAB, C. J.

This is a writ of review proceeding challenging the action of the Washington County Board of County Commissioners (Board) denying tentative approval of a proposed subdivision plat submitted by Commonwealth Properties, Inc. (Commonwealth).[1] The circuit court held that the Washington County Comprehensive Framework Plan was not applicable to the proposed subdivision and, alternatively, that even if the plan were applicable, its broadly worded general policy statements were too vague to serve as standards by which approval of the proposed subdivision plat could be granted or denied. For those reasons, the court held the Board could not refuse tentative approval. The Board appeals from that order.

In June, 1974, Commonwealth, a subdivider, applied to the Washington County Planning Commission for tentative approval of a proposed subdivision plat located within the county. In May, 1975, the Subdivision Committee of Washington County (apparently a subcommittee of the planning commission) recommended that tentative approval of the subdivision plat be granted, subject to certain conditions which Commonwealth agreed to comply with.

In June, 1975, the staff of the Washington County Planning Commission issued a report recommending that Commonwealth's request for tentative approval of its proposed subdivision plat be denied. Subsequently, the Washington County Planning Commission, after holding a public hearing, voted to deny Commonwealth tentative approval of its proposed subdivision plat. Commonwealth appealed the planning commission's denial to the Board. In August, 1975, the Board

---

[1]Since the validity of the comprehensive plan on which this case turns was in issue in *Fifth Avenue Corp. v. Washington Co.,* 282 Or 591, 581 P2d 50 (1978), we withheld decision until the Supreme Court issued an opinion in *Fifth Avenue.* The court upheld the validity of the comprehensive plan.

voted to affirm the decision of the planning commission. In so doing, the Board made the following findings:

"* * * * *

"It appearing to the Board that the findings of the Planning Department and the Board of County Commissioners should be adopted as the basis for the Board's decision, and the Board being fully advised in the premises; it is, therefore

"RESOLVED AND ORDERED that the findings of the Planning Department indicated in Exhibit 'A' attached to and made a part of this Resolution and Order are adopted as findings of this Board and the Board makes further and additional findings as follows:

"1. That a more detailed drainage study is needed in view of the slopes in the area and the amount of property that will be black topped for roads.

"2. That due to the slopes, lot sizes and lot shapes some lots may not provide building sites without variances from the zone requirements.

"3. That the goals of the Comprehensive Framework Plan to provide parks, bike paths, greenways and open spaces have not been addressed in the proposal.

"4. That the proposal might be appropriate for flat land on the valley floor but does not take into account the unique characteristics of this site, including slopes, water runoff and heavy vegetation as required by the Comprehensive Framework Plan.

"5. That the deficiencies of the proposal as noted in the staff and Board findings do not mandate a planned unit development on the property or cluster housing.

"6. That the subdivision ordinance provides alternatives by which the deficiencies noted above may be resolved and it is further

"RESOLVED AND ORDERED that based upon the foregoing findings and conclusions the application of Commonwealth Properties, Inc. for preliminary approval of Cedarglen Subdivision is hereby denied."

Exhibit A, referred to above by the Board, provided in pertinent part:

"*STAFF FINDINGS:*

"\* \* \* \* \*

"2. The subject site is a unique community element due to its natural character. The substantial vegetation, including old growth fir and cedar, plus the drainage way and slopes present both severe constraints to development and also great opportunity for creative approaches to site utilization.

   "a. The applicant has noted that there are over 2,000 trees on the site of over 8″ caliper. In identifying large trees for preservation, 6″ caliper is commonly utilized as a cut-off point.

   "b. Slopes on the site range up to 20%.

   "c. The drainage way which traverses the site is not identified as a 'flood hazard' or 'flood plain' area by the Public Works Department 'Flood Plain Series'. However, soil data indicates severe limitations in the area due to poor drainage.

"3. The proposed subdivision plan conflicts with natural site characteristics because:

   "a. Approximately 13% of the trees over 8″ caliper would be removed by the roads;

   "b. Assuming that 35% of any lot would be cleared for a house and driveway, a total of half of the vegetation on the site could be expected to be removed;

   "c. The road crossing of the drainageway requires a fill of about 9 feet;

   "d. Cuts for roads range up to 7 feet;

   "e. Slopes on roads range up to 20% in two locations;

   "f. 'Flag lots' have been created with 50 foot road frontage, making land use and preservation of trees inefficient.

"4. The proposed subdivision plan conflicts with the above noted Framework Plan goals with respect to the County's long range position of preserving the character of significant community elements, and of developing living environments in harmony with natural features of the county.

"5. The proposed subdivision plan also conflicts with the above noted Framework Plan policies:

"#27, Through lack of preservation of the natural character of the site and by not utilizing the Planned Unit Development process which could substantially increase development compatability;

"#30, Through conflict with natural features of the site;

"#37, Through applying a conventional RU-4 subdivision to the site without respect for its natural qualities;

"#42, Through not utilizing the flexibility contained within the P.U.D. provision;

"#190, Through not utilizing the drainageway on the site for its potential in a community greenway system;

"#194, Through not preserving the character of the drainageway;

"#196, Through not fully utilizing the drainageway in a broader natural drainage system;

"#197, Through not preserving existing vegetation within site development;

"#200, Through not utilizing available means (P.U.D. provisions) to preserve these unique natural features; and

"#224, Through not retaining distinctive natural features in the development.

"* * * * *

"RECOMMENDATION:

"Based on the above findings of conflict of the proposal with county policies relating to compatible development, and since the applicant has had ample opportunity and staff assistance to generate a development sensitive to the site, the staff recommends denial of the proposed preliminary plat * * *.

"* * * * *."

Following the Board's denial, Commonwealth filed a petition for writ of review in circuit court. In a consolidated pretrial order, the parties stipulated that the proposed subdivision plat complied with all the lot size and use requirements of the zoning ordinance applicable to the area in which the subdivision was to

be located and that the zoning classification of the area was in compliance with the Washington County Comprehensive Framework Plan.

■ The Board first contends that the circuit court erred in holding that Commonwealth's proposed subdivision was not required to comply with the policies enunciated in the Washington County Comprehensive Framework Plan. We agree with the Board's contention, as does Commonwealth itself. ORS 215.416(3), which deals with the procedures to be followed by counties in authorizing various types of land development including subdivisions, *see* ORS ch 215, specifically states that:

> "The application shall not be approved if the proposed use of land is found to be in conflict with the comprehensive plan of the county and other applicable ordinances * * *."

ORS ch 92 prescribes the statutory scheme for the creation and approval of subdivisions. ORS 92.044(6) and 92.090(2)(c), when read together, lead to the same conclusion as does ORS 215.416(3):

> "Any ordinance or regulation adopted under this section shall comply with the comprehensive plan for the city or county adopting the ordinance or regulation." ORS 92.044(6).
>
> "* * * * *
>
> "(2) No tentative plan for a proposed subdivision and no tentative plan for a proposed major partition shall be approved unless:
>
> "* * * * *
>
> "(c) The tentative plan complies with the applicable zoning ordinances and regulations and the ordinances or regulations adopted under ORS 92.044 that are then in effect for the city or county within which the land described in the plan is situated.
>
> "* * * * *." ORS 92.090.

The Board next contends that the circuit court erred in also holding that Commonwealth was not required to comply with the county comprehensive framework

plan because the plan contained only undefined, broadly worded general policy statements which were too vague to be capable of specific application to the proposed subdivision. The Board argues that a county comprehensive plan, by its very nature, must contain broadly worded general policy statements because the plan is designed to govern a wide variety of future development and differing geographic contexts within a county. To require such a plan to contain precise and meticulous decision-making criteria, the Board contends, would defeat the very purpose of the plan. The Board contends that *Board of Medical Examiners v. Mintz,* 233 Or 441, 378 P2d 945 (1963); *McCann v. OLCC,* 27 Or App 487, 556 P2d 973 (1976), *rev den* (1977); *Sun Ray Drive-In Dairy v. OLCC,* 20 Or App 91, 530 P2d 887 (1975); and *Sun Ray Dairy v. OLCC,* 16 Or App 63, 517 P2d 289 (1973), all demonstrate that the mere fact that it has relied on general standards not capable of precise definition prior to the time of decision-making does not render a decision based on findings of an equally vague and general nature invalid.

For the reasons which follow, we do not agree with the Board's position. Traditionally, subdivision planning enabling acts provide for submission of a tentative subdivision plat to the public body involved for approval prior to the submission of a final plat. The purpose of requiring submission of the preliminary plat is to enable the subdivider to obtain a preliminary appraisal of its proposed plat, including consideration of its proposals regarding street layout, preservation of natural site features, and a myriad of other factors which are involved in subdividing real property. In theory, at least, the subdivider will learn about what changes will be required in its subdivision plat prior to committing the additional time and money involved in preparation of a final plat. 4 R. Anderson, American Law of Zoning 70, § 23.12 (1977); 3 C. Rathkopf, The Law of Zoning and Planning 71-34, § 5 (1972).

The Oregon statutory scheme dealing with the creation of subdivisions follows this traditional two-step scheme. ORS 92.040 sets forth the procedures for approval of subdivision plats:

"* * * Before a plat of any subdivision or the map of any major partition may be made and recorded, the person proposing the subdivision or the major partition or his authorized agent or representative shall make an application in writing to the county or city having jurisdiction under ORS 92.042 for approval of the proposed subdivision or the proposed major partition in accordance with procedures established by the applicable ordinance or regulation adopted under ORS 92.044. Each such application shall be accompanied by a tentative plan showing the general design of the proposed subdivision or the proposed major partition. No plat for any proposed subdivision and no map for any proposed major partition may be considered for approval by a city or county until the tentative plan for the proposed subdivision or the proposed major partition has been approved by the city or county. Approval of the tentative plan shall not constitute final acceptance of the plat of the proposed subdivision or the map of the proposed major partition for recording; however, approval by a city or county of such tentative plan shall be binding upon the city or county for the purposes of the preparation of the plat or map and the city or county may require only such changes in the plat or the map as are necessary for compliance with the terms of its approval of the tentative plan for the proposed subdivision or the proposed major partition."

Any zoning authority approval or denial of a proposed subdivision plat must comply with the requirements of ORS 215.416(5) and (6) which provide:

"(5) Approval or denial of a permit application shall be based on standards and criteria which shall be set forth in the zoning ordinance or other appropriate ordinance or regulation of the county and which shall relate approval or denial of a permit application to the zoning ordinance and comprehensive plan for the area in

[ 395 ]

which the proposed use of land would occur and to the zoning ordinance and comprehensive plan for the county as a whole.

"(6) Approval or denial of a permit shall be based upon and accompanied by a brief statement that explains the criteria and standards considered relevant to the decision, states the facts relied upon in rendering the decision and explains the justification for the decision based on the criteria, standards and facts set forth."

■ Once a subdivider obtains tentative approval of its proposed plat, such approval is binding on the county involved as far as final approval of the plat is concerned. The only changes that the county may require are those necessary for compliance with its terms of approval of the tentative draft of the proposed subdivision. Thus, it is evident that the most critical step in the subdivision plat application procedure is the zoning authority approval of the tentative plat of the proposed subdivision, for once such approval is given the zoning authority is held to its terms in its final action. *See Bienz v. City of Dayton,* 29 Or App 761, 769, 566 P2d 904, *rev den* (1977).

■ We agree with the Board that a comprehensive plan, by its very nature, must contain broadly worded general policy statements which will be applicable to a wide variety of land use decisions. ORS 197.015(4), which defines a comprehensive plan, indicates that the legislature intended that comprehensive plans contain a summary of land use policies couched in broad terms capable of wide-ranging application:

"As used in ORS 197.005 to 197.430 and 469.350, unless the context requires otherwise:
"* * * * *

"(4) 'Comprehensive plan' means a generalized, coordinated land use map and policy statement of the governing body of a state agency, city, county or special district that interrelates all functional and natural systems and activities relating to the use of lands, including but not limited to sewer and water systems, transportation systems, educational systems, recreational facilities, and natural resources and air and water

[ 396 ]

quality management programs. 'Comprehensive' means all-inclusive, both in terms of the geographic area covered and functional and natural activities and systems occurring in the area covered by the plan. 'General nature' means a summary of policies and proposals in broad categories and does not necessarily indicate specific locations of any area, activity or use. A plan is 'coordinated' when the needs of all levels of governments, semi-public and private agencies and the citizens of Oregon have been considered and accommodated as much as possible. 'Land' includes water, both surface and subsurface, and the air."

However, it does not follow that a decision made under a broadly worded, very general plan may be as vague as the plan itself.

The Washington County Comprehensive Framework Plan is 151 pages in length and contains over 260 broadly worded policy statements governing future land use in the county. The record indicates that after Commonwealth filed its proposed subdivision plat in June, 1974, it negotiated with various land use planning agencies of the county for almost one year in an attempt to conform its proposed subdivision with the comprehensive plan requirements of the county as articulated by these agencies. In May, 1975, Commonwealth agreed to comply with the subdivision committee's requests for various changes in the proposed subdivision plat. However, two months later, the Board voted to deny tentative approval of the proposed plat because of Commonwealth's failure to conform to a variety of policies enunciated in the county comprehensive plan.

The Board's denial was couched in general language and failed to specify what criteria were used to arrive at the conclusion that the proposed plat did not comply with the plan. For example, the Board adopted Findings of the Planning Commission which recommended that tentative approval of the plat be denied because of Policy No. 30, requiring that "the distinctive natural features [of a site] will be retained and

incorporated into all developments." The commission stated that this policy was violated by the following facts:

"3. The proposed subdivision plan conflicts with natural site characteristics because:

"a. Approximately 13% of the trees over 8" caliper would be removed by the roads;

"b. Assuming that 35% of any lot would be cleared for a house and driveway, a total of half of the vegetation on the site could be expected to be removed;

"c. The road crossing of the drainageway requires a fill of about 9 feet;

"d. Cuts for roads range up to 7 feet;

"e. Slopes on roads range up to 20% in two locations;

"f. 'Flag lots' have been created with 50 foot road frontage, making land use and preservation of trees inefficient."

Nowhere did the commission indicate why it chose trees of 8-inch caliper, lot clearance of 35 percent or road cuts of over 7 feet as the standards by which compliance with the policy involved here was to be measured. *McCann v. OLCC,* 27 Or App 487, 556 P2d 973 (1976), *rev den* (1977); *Sun Ray Dairy v. OLCC,* 16 Or App 63, 517 P2d 289 (1973). More importantly, nowhere did it indicate what figures, if any, would be acceptable. Similarly, the commission also found that plan policy No. 197, providing that "areas with significant existing vegetation will be developed to preserve that vegetation as a part of the development" was in conflict with the proposed subdivision plat. However, the commission never indicated what criteria should be utilized by Commonwealth in selecting which vegetation should be preserved in order to comply with the policy. It simply stated that the proposed subdivision was in conflict with the policy. A graphic example can also be found in the Board's finding No. 2 that

"* * * due to the slopes, lot sizes and lot shapes *some* lots *may not* provide building sites without variances from the zone requirements." (Emphasis supplied.)

This finding is phrased in such a manner as to make it difficult, if not impossible, for Commonwealth to know exactly which lots need to be redesigned to avoid the variance requirement.

■ The Board mistakenly contends that past decisions of this court and the Supreme Court hold that such generalized findings as the ones recited above are proper. While it is true that we have held that statutory law allows an agency to utilize a broadly worded general standard in making administrative decisions, we have also stressed that

> "[a]n applicant * * * should be able to know the standards by which his application will be judged *before* going to the expense in time, investment and legal fees necessary to make application * * *." *Sun Ray Dairy v. OLCC,* 16 Or App 63, 71, 517 P2d 289 (1973). (Emphasis supplied.)

*See also McCann v. OLCC,* 27 Or App 487, 556 P2d 973 (1976). An applicant, be he seeking a liquor license or a subdivision, should not be put in a position of having his success or failure determined by guessing under which shell lies the pea. The Supreme Court recently articulated similar considerations in the course of discussing the Energy Facility Siting Council's duty to promulgate standards for the construction of nuclear power facilities in this state in *Marbet v. Portland Gen. Elect.,* 277 Or 447, 460, 561 P2d 154 (1977):

> "* * * The planning of energy facilities takes too much effort, time and expense to be exposed to rejection under a standard which the applicant could not have known even in broad terms and which it might not have undertaken to meet * * *."

*Marbet* goes on to state that although the energy council's standards for plans and siting could only initially be stated in general terms and could be made more concrete only in the course of a proceeding focusing on a particular installation at a particular location,

> "* * * at some point [the council's standards] must become standards *for* making the council's eventual

decision, not merely findings *in* making the decision."
277 Or at 460.

In other words, it is not necessary that every standard used by an agency specifically articulated prior to the initiation of an administrative proceeding

> "* * * as *long* as *it is in fact adopted as a standard* * * * sufficiently in advance of the final decision so that the applicant * * * can address the import of the standard for a particular project * * *." 277 Or at 463.

■■ The two-step procedure required for final approval of proposed subdivision plats provides a mechanism for the application of these principles. Because the considerations involved in the approval of a proposed subdivision plat are complex and are inextricably intertwined with the broadly worded policies enunciated in the county comprehensive plan, it is necessary for the county, at some time, to announce to a subdivider both which plan policies will govern the granting of such approval and specifically how those policies will be applicable to the project in question. We assume that in many instances planning authorities will communicate, at least preliminarily, much of this information to subdividers on an informal basis prior to the hearing on tentative approval. In any event, such information must be provided to a subdivider at the time at which the county acts on the request for tentative approval of the proposed plat. The grounds for the decision at that time will serve as the standards by which the planning authority later acts to grant or to deny final approval of a proposed subdivision. In the case of a denial of tentative approval, these grounds must be articulated in a manner sufficiently detailed to give a subdivider reasonably definite guides as to what it must do to obtain final plat approval, or inform the subdivider that it is unlikely that a subdivision will be approved.

■ The broadly worded findings contained in the Board's order were insufficient to give Commonwealth such information. The Board's order does not meet the

specificity requirements of *Marbet, Sun Ray Drive-In Dairy, McCann* or ORS 215.416(6) and we therefore remand for more adequate findings and conclusions based on those findings.

Reversed and remanded.