Argued November 26, reversed and remanded December 24, 1973

# SUN RAY DRIVE-IN DAIRY, INC., *Petitioner, v.* OREGON LIQUOR CONTROL COMMISSION, *Respondent.*

517 P2d 289

*D. S. Denning, Jr.,* Vale, argued the cause for petitioner. With him on the brief were Schroeder, Denning & Hutchens, Vale.

*John W. Burgess,* Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and W. Michael Gillette, Solicitor General, Salem.

Before SCHWAB, Chief Judge, and FOLEY and TANZER, Judges.

TANZER, J.

Petitioner appeals from an order of the Oregon

Liquor Control Commission denying its application for a Class B Package Store liquor license[1] for its store in Ontario, Oregon. The commission based its refusal on ORS 471.295 (1)[2] which provides that the commission may refuse to license an applicant if it has reasonable ground to believe that there are "sufficient licensed premises in the locality" or that the granting of the license is "not demanded by public interest or convenience." The commission found as ultimate facts that there were sufficient licensed premises in the area, there were local objections to issuance of the license and that the applicant was not a grocery store, and denied the application.

The evidence at the hearing on petitioner's application showed that petitioner is a corporation doing business in Idaho and Oregon. At the time of the hearing petitioner had 12 stores in Idaho and two

---

[1] ORS 471.260 provides as follows:

"(1) A package store license shall allow the retail sale of certain specified types of alcoholic liquor in sealed packages. Package store licensees shall not permit the consumption of alcoholic liquor upon their licensed premises unless such licensee holds another license that permits such consumption.

"(2) Package store licensees shall be of two classes:

"(a) Class A package store license, which shall allow the sale of pasteurized malt beverages containing not more than four percent of alcohol by weight.

"(b) Class B package store license, which shall allow the sale of pasteurized malt beverages containing not more than eight percent of alcohol by weight and wine containing not more than 14 percent of alcohol by volume."

[2] ORS 471.295 (1) provides as follows:

"The commission may refuse to license any applicant if it has reasonable ground to believe any of the following to be true:

"(1) That there are sufficient licensed premises in the locality set out in the application, or that the granting of a license in the locality set out in the application is not demanded by public interest or convenience."

stores in Oregon. Petitioner's stores specialize in the sale of convenience grocery products and beverages. At the time of the hearing, petitioner's Ontario store had a grocery inventory of $6,000 to $7,000, restocked weekly, and the store's monthly grocery sales were shown to be in the area of $7,000 to $9,000, the major share of which was dairy and bakery products processed or baked by petitioner. In addition to groceries, petitioner's Ontario store sells gasoline under a commission arrangement with the Time Oil Company.

Various persons employed by the licensing division of the commission testified at the hearing on petitioner's application. Mr. William Alexander, a liquor control officer, testified that he had done a background investigation of the applicant and made a survey in the area to determine people's attitudes toward whether petitioner's application should be granted. Mr. Alexander initially testified that he recommended refusal of petitioner's application because of (1) objections of area residents; (2) the large number of existing outlets; and (3) the fact that petitioner's store did not have a broad inventory of groceries. However, he subsequently abandoned the last ground. He testified that even if the petitioner's store had been a Safeway, he would have recommended refusal because of the number of outlets already in the area. Mr. Alexander's "conservative" estimate was that there were 15 Class B Package Store licensees in Ontario.

Mr. Alexander's recommendation of refusal was passed on to his direct superior, Mr. Charles Miller, who testified that he reviewed Mr. Alexander's report and agreed that the application should be denied. Mr. Miller's reasons, like Mr. Alexander's, were (1) that there were sufficient licensed places in the area (eight outlets in an eight or nine block area), and (2) that

there had been objections from area residents. Mr. Miller testified that he had no "yardstick" to go by, and that his recommendation was based on his "past experience and judgment."

Mr. Miller's recommendation was, in turn, passed on to Mr. Don Church, the commission's director of licensing. Mr. Church testified that the number of other licensees in a particular area was not a factor in deciding whether to issue a license; rather, the main factor, in his opinion, was whether the operation in question was a "legitimate grocery store." Mr. Church stated that if a store is deemed by the commission to be a "legitimate grocery store," the commission's policy is to grant the store a Class B Package Store license, regardless of how many other licensees are in the immediate area. The reason for his recommendation of denial to the commission, Mr. Church said, was that petitioner's store had been represented to him in the reports from his subordinates as a "gasoline station with dairy products." Mr. Church concluded from the evidence he heard at the hearing that petitioner's store more closely approximated a "legitimate grocery store" than he had supposed, but that there would have to be still greater expansion of the scope of petitioner's inventory and the number of items of each type before he would recommend approval. Mr. Church expressed concern, for example, that the store's inventory listed only three packages of Birdseye creamed peas.

Petitioner gave evidence that several similar businesses in the Ontario area and neighboring cities, some with significantly smaller grocery inventories and one that appears to be an ordinary gas station, had package licenses.

The commission then made the following find-

ings of fact and ultimate facts upon which the denial of license is based:

## "FINDINGS OF FACT

"Sun Ray Drive-In Dairy, Inc., an Idaho corporation, authorized to do business in Oregon, applicant for Package Store Class B license in trade name 'Sun Ray Dairy', 425 S. W. 4th, Ontario, Oregon, through its representatives D. S. Denning, Jr., Attorney at Law, Vale, Oregon, and its President Ray Ayers of Boise, Idaho, factually demonstrated that the organization has been in business in Idaho since 1961, starting with the sale of dairy and bakery products; that they now have fourteen stores in operation and that their Sun Ray Dairy store in Ontario during the month of January, 1973, made gross sales of $15,797.25 plus sales of dairy and food items of $8,909.18; that theirs is a 'convenient convenience' store with inventory running about 6 to $7,000.00 which inventories are refilled weekly. There were local objectors to the issuance of PB license to the applicants. There are fifteen licensed outlets for beer sales in Ontario, with five outlets within four blocks of the applicant. The listed inventory was not sufficient for a grocery store. The Commission particularly noted applicant's inventory listed one can of beef stew, three—twelve ounce packages of weiners, two cans of chili, three cans of pork and beans and one Quaker Oats together with other groceries and dairy products.

## "ULTIMATE FACTS

"There are sufficient licensed premises in the locality of the application. There were local objections to the issuance of Package Store Class B license to the applicant. The applicant's inventory is not sufficient for a grocery store."

■ Petitioner asks that we reverse the findings of fact, contending that the proof of each ultimate fact

was otherwise. We are unable to review for substantial evidence because we are unable to ascertain the issues or the standards against which the evidence is to be measured. How many licensed premises are "sufficient" in the "locality"?[6] Is sufficiency to be measured by population density, supply and demand, geographical area to be covered, other factors, or a combination of factors? How are public objections to be weighted?[7] What ratio of acceptability should be required? Within what area of the license applicant? Finally, are all grocery stores entitled to a package license? If so, how is "grocery store" defined?

The legislature has not answered these questions by statute. ORS ch 471 dealing with the issuance of liquor licenses does not purport to articulate the circumstances under which a license must be granted. Rather, ORS 471.295 is phrased in the negative, providing that the commission may refuse to license any applicant if it has reasonable ground to believe any of a number of specific or general conditions exist. While a liquor license is a "purely personal privilege," ORS 471.301 (1)(a), it is also a thing of substantial value to the applicant. The negative context of the statute implies that an applicant is entitled to a license so long as certain circumstances set out in the statute or in implemental regulations are not shown to be true.

---

[6] Mr. Alexander described the density of package store outlets as 15 in Ontario. Mr. Miller described 18 outlets in an eight or nine block area. The findings of fact assert yet a third figure of five outlets within four blocks of the applicant. Our review of the record does not disclose the source of that statistic.

[7] The record reveals that 12 individuals were interviewed by the inspecting officer. Of the 12, seven objected to the issuance of the license, while five did not object. Of the seven objectors, four were associated with gasoline stations in the vicinity of petitioner's store, and were apparently concerned primarily with petitioner's proposed selling of liquor and gasoline at the same establishment.

The commission has not published rules or regulations establishing standards by which the statutory grounds for refusal for "sufficient licensed premises in the locality" or that the license "is not demanded by public interest or convenience," ORS 471.295 (1), are to be applied. Instead, the licensing personnel of the commission testified at the hearing as to the "policy" of the commission. Those policies, the testimony indicates, are informal and unwritten, drawn by the witnesses from their understanding of historical patterns of individual commission rulings. As such, they have the quality of folklore in that unwritten rules are passed on orally by culture carriers from one generation of employes to another, from one level of employes to another, without the stabilizing effect of the written word.

■ A legislative delegation of power in broad statutory language such as the phrase "demanded by public interest or convenience" places upon the administrative agency a responsibility to establish standards by which that law is to be applied. *See Bergford v. Clack. Co./Trans. Serv.,* 15 Or App 362, 515 P2d 1345 (1973), and *Warren v. Marion County,* 222 Or 307, 353 P2d 257 (1960). The legislature has provided for such rule making in the Administrative Procedures Act, ORS 183.355 et seq.

■ Compliance with the Administrative Procedures Act is much more than an act of technical legal ritual. Unwritten standards and policies are no better than no standards and policies at all. Without written, published standards, the entire system of administrative law loses its keystone. The ramifications affect every party and every procedure involved in the fulfillment of the agency's responsibility under the law, e.g., the public, the applicant, agency personnel, the participants

in the hearing, the commission, the legislature and the judiciary.

The policies of an agency in a democratic society must be subject to public scrutiny. Published standards are essential to inform the public. Further, they help assure public confidence that the agency acts by rules and not from whim or corrupt motivation. In addition, interested parties and the general public are entitled to be heard in the process of rule adoption under the Administrative Procedures Act.

An applicant for a license should be able to know the standards by which his application will be judged before going to the expense in time, investment and legal fees necessary to make application. Thereafter, he is entitled to even treatment by rule of law and reasonable confidence that he has received such treatment. This cannot be achieved without published rules.

■ ■ Cases are usually disposed of without litigation. In most situations, the law and the agency policy are expressed in the actions of agency personnel who deal with the public. Written standards and policies are essential to assure an acceptable degree of consistency of practice among the personnel of the agency. In this case, as an example of what occurs in the absence of rules, the field investigator and his supervisor each recommended against approval because of the number of licensees already in the area, but the director of licensing who was in charge of their activities testified that the number of pre-existing outlets was not significant. He recommended disapproval because applicant was not a grocery store. The order of the commission, however, adopts both reasons as grounds for its denial. An administrative agency cannot properly perform its

duty under the law unless employees at all levels work toward the same objectives under a clear direction of policy from the head of that agency, in this case the commission. The public is entitled to consistency of enforcement from the agency. That situation cannot be achieved in the absence of written standards.

■ The parties to a hearing of a contested case must know what is to be heard in the hearing. The agency and the applicant are entitled to know what they are required to prove and disprove in order to gather and present their evidence. The hearings officer must have standards so that he can determine questions of materiality and relevance and propose appropriate findings and conclusions to the commission.

Written standards enable the decision-making body, in this case the commission, to make its decisions by rule of law rather than for subjective or ad hominem reasons. In this case, for example, the applicant introduced evidence of several similar businesses in the area which had package licenses. There is no way for him or for us to know whether he was singled out for discriminatory treatment or whether he was subjected to the same policy standards which were employed when the other comparable outlets were licensed and renewed. We recognize the wide discretion vested in the commission by its enabling legislation, *see*, e.g., *Olds v. Kirkpatrick*, 183 Or 105, 191 P2d 641 (1948), *Perry v. Oregon Liquor Commission*, 180 Or 495, 177 P2d 406 (1947), but that discretion is not unbridled. It is discretion to make policies for even application, not discretion to treat each case on an ad hoc basis. The danger of inconsistent, subjective and ad hominem decision making is minimized by the deliberate adoption of written, published policy standards applicable alike to all applicants.

The legislature is entitled to know whether or not the policies and practices of the agency are consistent with the legislative policies upon which the delegation of legislative power to the agency is based. In the absence of published rules, members of the legislature must form their judgments instead upon rumor, individual cases, isolated news reports and other fragmentary, impressionistic and often unreliable sources of information. Published standards are necessary to the proper performance of the duty of legislative oversight of executive agencies operating under legislative delegations of power.

■ Finally, and most directly applicable to this case, the parties to a contested case are entitled to judicial review under ORS 183.480. Judicial review is among the safeguards which serve to legitimatize broad legislative delegations of power to administrative agencies. *See Warren v. Marion County,* supra. In the absence of standards, however, the courts are unable to perform that task of judicial review. We cannot determine whether substantial evidence supported the findings because we cannot know what was in issue at the hearing. For example, we do not have a definition of "grocery store" within the purposes of ORS ch 471 and, if we did, we are unable to ascertain the legal significance of a finding under that definition. It is not for the court, but for the administrative agency with its statutory mandate and its expertise to develop standards. *See* Davis, Administrative Law Text 36-41, § 2.06 (1972), *Van Ripper v. Liquor Cont. Com.,* 228 Or 581, 365 P2d 109 (1961). Were we to decide this case in the absence of administratively adopted standards, we would necessarily either be imposing court-made standards on the agency or we would ourselves be guilty of subjective decision making. Either role

would be deleterious to the ability of the agency to fulfill its proper administrative role. Until the commission adopts appropriate rules, we cannot perform our judicial function.

Therefore, we vacate the order, remand this case and direct that the Oregon Liquor Control Commission not act on petitioner's application until it has first adopted rules pursuant to the Administrative Procedures Act, ORS ch 183, designed to accomplish the legislative purposes of ORS 471.260 and 471.295 (1) which will be applicable to this applicant as well as to all other applicants for issuance or renewal of licenses alike.

■ We do not require the impossible. We require that the agency formulate and publish the broad bases upon which decisions regarding issuance of liquor licenses will be made. To use an example pertinent to this case, if the commission wishes to restrict the issuance of Class B Package Store licenses to "grocery stores," it should (a) state that criterion in a published administrative regulation which has run the gauntlet of notice, hearing and publication under the Administrative Procedures Act; and (b) go on to define in a meaningful way what is meant by that term within the statutory purpose. Definitions need not be so meticulous as to be unworkable. *Board of Medical Examiners v. Mintz*, 233 Or 441, 447, 378 P2d 945 (1963). For instance, the commission need not and, indeed, probably should not specify the precise volume of frozen creamed peas, beef stew, weiners, chili, pork and beans or oats which the store must stock to qualify. On the other hand, we see no major difficulty in the commission's formulating guidelines which may appear to the commission to be factors in the determination of

whether denial of a license to a given store is within "the public interest or convenience." Similarly, if certain criteria are more or less important than others, that fact should also be articulated. In this case, for example, the commission's director of licensing testified that the number of outlets in the applicant's area is not very important (at least to him) and that the important factor is whether the store is a "legitimate grocery store." If his belief accurately reflects commission policy, such a priority should be set out in published form for the guidance of applicants and agency personnel alike.

Reversed and remanded for further proceedings consistent with this opinion.