Argued April 18, reversed and remanded June 11, 1979

OLIVER, *Petitioner,*

*v.*

EMPLOYMENT DIVISION, *Respondent*

(No. 78-AB-1062, CA 12752)

595 P2d 1252

Leilan J. Greer, Oregon Legal Services, Pendleton Regional Office, Pendleton, argued the cause and filed the briefs for petitioner.

James C. Rhodes, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were James A. Redden, Attorney General, and Walter L. Barrie, Solicitor General, Salem.

Before Schwab, Chief Judge, and Richardson and Roberts, Judges.

SCHWAB, C. J.

## SCHWAB, C. J.

Claimant appeals from a split decision of the Employment Appeals Board denying his claim for unemployment compensation. The reason for the denial was the conclusion of the authorized representative of the assistant director of the Employment Division, the referee and Board majority that claimant was not "available for," or "actively seeking," employment within his geographic "labor market." We conclude, applying the test of *McPherson v. Employment Division*, 285 Or 541, 591 P2d 1381 (1979), that the quoted terms are primarily for administrative, not judicial, definition. We further conclude that administrative definition must begin with expression of agency policy in formally adopted rules. Finding the pertinent administrative rule insufficient, we reverse and remand for further proceedings.

### I

As a result of a childhood disease, claimant has permanent nerve damage that results in impaired coordination and communication ability. He was a patient at the State Hospital for about 10 of his 33 years. He does not drive.

Claimant's employment history is limited to unskilled jobs. He has worked as a kitchen helper in restaurants and as a gasoline station attendant. None of his jobs has paid more than the minimum wage. Due to his disability it is unlikely claimant will ever work at a job that pays much more than the minimum wage. Claimant usually lives with or near family members when he works.

During the period in question, claimant was living with his parents in the small community of Stanfield. It is conceded that he was sincerely and actively seeking work in Stanfield and in Hermiston, about five miles away. He applied for jobs as a dishwasher, bartender, gas station attendant and grocery

store cashier. Claimant, however, was not willing to extend his job search substantially beyond Hermiston because of transportation problems. Because he does not drive and no public transportation is available, he had no choice but to rely on his family to drive him to and from work each day. His parents were willing to make two 10-mile round trips a day to take claimant to a job in Hermiston and to bring him back home. But they were not willing—and doubted they could afford—to drive a much greater distance transporting claimant to and from work.

The authorized representative at claimant's local Employment Division office ruled that claimant was not "available for" and "actively seeking" employment within his geographic "labor market," which was regarded as extending as far as Boardman, about 30 miles from claimant's home in Stanfield. On appeal, a referee reached the same conclusion based on different reasoning. On further appeal, the majority of the Employment Appeals Board adopted the decision of the referee. The dissenting Board member stated: "If a claimant, like this claimant, can only expect to obtain a minimum wage for his work, it is unreasonable to expect him to define his labor market area or to have it defined for him in such a way that the transportation costs that might normally be expected would deprive him of the fruits of his labor."

## II

*McPherson v. Employment Division, supra*, held that the Unemployment Compensation Act, ORS ch 657, contains two different types of terms: (1) those that the courts have the primary responsibility to interpret and define; and (2) those that the agency has the primary responsibility to interpret and define. Examples of terms for judicial interpretation are: employment, direction or control, and independently established business. 285 Or at 550. Such terms are for the courts to interpret because they refer "to relationships that meet certain definable legal tests." 285 Or

at 550. Examples of terms for administrative interpretation are: good cause, unfair, unreasonable, and public convenience and necessity. 285 Or at 550. Such terms are for the agency to interpret because they call "for completing a value judgment that the legislature itself has only indicated." 285 Or at 550.

■ *McPherson* further held that it was improper for this court to formulate any definition of terms like "good cause" because such terms were for administrative, not judicial, definition. It is, however, a judicial task to determine which terms in the Unemployment Compensation Act are for agency definition, how agency policy should be adopted and expressed, and what procedure this court should follow until the present policy vacuum is remedied by agency action.

## III

■ *McPherson* involved ORS 657.176(2), which provides:

> "If the authorized representative designated by the assistant director finds:
>
> "(a) The individual has been discharged for misconduct connected with his work, or
>
> "(b) The individual has been suspended from work for misconduct connected with his work, or
>
> "(c) The individual voluntarily left work without good cause, or
>
> "(d) The individual failed without good cause to apply for available suitable work when referred by the employment office or the assistant director, or
>
> "(e) The individual failed without good cause to accept suitable work when offered to him,
>
> the individual shall be disqualified from the receipt of benefits until he has performed service for which remuneration is received equal to or in excess of his weekly benefit amount in four separate weeks subsequent to the week in which the act causing the disqualification occurred."

*McPherson* specifically held that the "good cause" language in subparagraph (2)(c) delegates a "value-judgment" type of policy determination to the administrative agency. Given that holding, we think it

follows that the other questions that can arise under ORS 657.176(2)—"misconduct" in subparagraphs (2)(a) and (b), and "suitable work" in subparagraphs (2)(d) and (e)—are likewise "value-judgment" policy questions for the agency.

This case arises under ORS 657.155(1)(c):

"An unemployed individual shall be eligible to receive benefits with respect to any week only if the administrator finds that:

" * * * * *

"(c) He is able to work, is available for work, and is actively seeking and unable to obtain suitable work. No individual participating in a community work and training program, as defined in ORS 411.855, shall, solely by reason thereof, be deemed unavailable for work within the meaning of this section."

This statute contains several terms that are about as elastic as "good cause" in ORS 657.176(2)(c): "able to work"; "available for work"; "actively seeking"; and "suitable work." However, unlike the situation with "good cause," the legislature has partially defined some of these terms. For example, the last sentence of ORS 657.155(1)(c) states a partial definition of availability for work; ORS 657.155(2) states a partial definition of able to work; and ORS 657.190 and 657.195 state some of the factors germane to whether work is suitable. Despite those partial definitions, there remains considerable room to flesh out concepts like ability, availability, actively seeking and suitable work. We have already concluded that the suitable-work concept expressed in ORS 657.176(2)(d) and (e) is for agency implementation; the same result follows for the same suitable-work concept in ORS 657.155(1)(c). As indicated above, ORS 657.155(1)(c) contains other terms that also call "for completing a value judgment that the legislature itself has only indicated." 285 Or at 550. They are therefore for administrative, not judicial, definition.

IV

In *McPherson*, the Supreme Court's ultimate dispo-

sition was: "the case must be remanded to the [Employment] Division for reconsideration by the assistant director's authorized representative in light of this opinion." 285 Or at 557. This disposition may imply that the Supreme Court contemplated that Employment Division formulation of policy could occur on a purely ad hoc basis in the process of adjudicating individual unemployment compensation claims. We nevertheless conclude that the essential first step is the formal adoption of rules that express Employment Division policy.

There are three reasons for our conclusion that Employment Division policy must be expressed in rules: (A) the Administrative Procedures Act; (B) the Unemployment Compensation Act; and (C) the structure for processing unemployment compensation claims.

A

■ *Marbet v. Portland Gen. Elect.*, 277 Or 447, 561 P2d 154 (1977), discusses whether, under the Administrative Procedures Act, administrative agency policy must be expressed in rules or whether policy can be articulated solely in the course of deciding individual contested cases. 277 Or at 458-64. While much of that discussion is dicta, and comes to no specific conclusion, we find several implications that an administrative agency cannot generally take a *purely* ad hoc approach to articulating policy. For example:

> "* * * When the decision of a concrete case presupposes agency adoption of general standards under which it is to be decided, those standards normally must be adopted by rulemaking procedure before they can be applied in the case. However, the APA also recognizes that a general rule will sometimes be stated in explaining a particular decision by an agency, just as by a court * * *." 277 Or at 461.

We thus read *Marbet* as suggesting it would be a violation of the Administrative Procedures Act for an

[493]

agency to make policy on what is "good cause," "misconduct," "suitable employment," etc., on a purely case-by-case basis. We adopt that prior suggestion as our present holding. *See also Sun Ray Dairy v. OLCC,* 16 Or App 63, 517 P2d 289 (1973); *McCann v. OLCC,* 27 Or App 487, 556 P2d 973 (1976), *rev den* (1977).

Like the Supreme Court in *Marbet,* we do not in this case attempt any comprehensive definition of when policy must be adopted by rulemaking. Rulemaking probably becomes more critical in proportion to the breadth of policymaking responsibility delegated to an agency, the volume of cases the agency handles and the manner in which it handles them. *McPherson* held the Employment Division has a substantial amount of policymaking responsibility; we know it must handle a huge number of unemployment compensation claims; and below in Part C we discuss the statutorily dictated unique procedure for adjudicating such claims. If any agency in any situation should be required to express general policy by rulemaking, it is this agency in this situation.

B

Alternatively, it may be that the requirement of expressing administrative policy in rules never arises solely from the Administrative Procedures Act but, rather, from the APA and the statutes administered by the agency construed together. The Supreme Court's approach in *Marbet,* for example, involved reliance on both the APA and the statute administered by the agency involved there.

■ We conclude that the Unemployment Compensation Act, ORS ch 657, contemplates that at least most agency policy will be expressed in rules. ORS 657.610(1) provides:

"The administrator shall determine all questions of general policy and promulgate rules and regulations and be responsible for the administration of this chapter."

In addition to this general statement, the specific statutes governing claim processing and eligibility requirements contain numerous references to administrative rules and regulations. ORS 657.100, 657.105, 657.150(3), 657.155(1)(a), 657.255(1), 657.260(1), 657.280(1); *see also* 657.625.

## C

Finally, the structure for processing unemployment compensation claims makes purely ad hoc policymaking improper.

When a claim is made, the claimant's last employer is notified, ORS 657.265(1), and has an opportunity to communicate any objections to the Employment Division, ORS 657.265(5), but nothing in the statutes requires the employer who has any relevant information to communicate it at this stage. An initial decision on the claim is then made by "an authorized representative." ORS 657.265(2). As we understand it, "authorized representative" refers to many Employment Division employes stationed in local offices throughout the state.

Thus, the initial authorized representative's decision can be and probably usually is based only on the information supplied by the claimant on the application form. In fact, the statutes make three separate references to the initial decision's being based on the "available information." ORS 657.265(2), (4) and (5). Moreover, there is no provision for centralized control over this decisionmaking process. *Cf. Anderson v. Employment Division*, 24 Or App 503, 509-10, 546 P2d 779 (1976) (concurring opinion): "Apparently, either the local [Employment Division] personnel are unaware of the interpretation placed on OAR 471-30-070 by the Employment Division [in Salem], or they are operating autonomously." As a practical matter, the policymaking contemplated by *McPherson* cannot occur in such a factual vacuum and in such a decentralized way.

## V

The present record documents the Employment Division's capacity to express policy in formally adopted rules, and the need for reasonable specificity in such rules. The actual basis for denying the present claim was an Employment Division rule, OAR 471-30-036, which provides:

"(1) In considering suitable work factors under ORS 657.190 and for purposes of determining eligibility under ORS 657.155(1)(c), the Administrator may require an individual to actively seek the type of work the individual is most capable of performing due to prior job experience and training except that: (a) If an individual is unable to secure his customary type of work after contacting the potential employers in the *labor market* where benefits are being claimed, the Administrator may require the individual to seek less desirable but similar work or work of another type which the individual is capable of performing by virtue of experience and training.

"(b) If the type of work an individual is most capable of performing does not exist in the *labor market* where the individual is claiming benefits, the Administrator may require the individual to seek any work that exists in the *labor market* for which the individual is suited by virtue of experience and training.

"(c) After the individual has contacted the potential employers in the *labor market* where benefits are being claimed and is still unable to obtain work as described in (a) and (b) of this subsection, the Administrator may require the individual to further expand his work seeking activities.

"(2) For the purposes of ORS 657.155(1)(c), an individual shall be considered able to work only if he is physically and mentally capable of performing work during all of the customary workweek for the type of work being sought pursuant to the provisions of subsection (1) of this section. However, an occasional and temporary disability for less than half the customary workweek shall not result in a finding that the individual is unable to work for the week.

[496]

"(3) For the purposes of determining whether or not an individual is available for work under the provisions of ORS 657.155(1)(c), the Administrator shall require at a minimum:

"(a) That the individual be willing to work full time during all of the usual hours and days of the week customary for the work he is seeking pursuant to subsection (1) of this section.

"(b) That the individual be reasonably accessible to any suitable work opportunities within the *labor market* in which he is seeking work pursuant to subsection (1) of this section, including any temporary work opportunities that are otherwise suitable unless such temporary work will bar or interfere with his return to his regular employment.

"(c) That the individual has not imposed conditions which substantially reduce his *labor market* attachment." (Emphasis supplied.)

More specifically, and as previously stated, in this case the authorized representative, then the referee, and then a majority of the Employment Appeals Board determined that claimant was not "available for" and "actively seeking" employment within his geographic "labor market" which extended about 30 miles from his home to Boardman.

It is not disputed that claimant was available for and actively seeking employment within a smaller area. Nor is it disputed that claimant, because of his transportation problems, was not seeking employment within the entire larger area. So this whole case turns on the appropriate definition of "labor market," as that term applies to claimant.

The term "labor market" appears six times in OAR 471-30-036 but is not defined at any point in the Employment Division rules. This lack of definition has apparently produced a situation which allows or compels each level in the decisionmaking process to create its own definition. A person who identified herself as "an authorized representative of the Employment Division, with the Hermiston local office" testified

about how "labor market" had been interpreted and applied in claimant's case. Parts of the testimony are hard to understand, but it appears that three separate points were being addressed: (1) *what* was claimant's labor market; (2) *how* was that determination made; and (3) *who* made the determination.

The testimony was relatively clear on what the authorized representative believed claimant's labor market to be: "It's quite a large area * * * [that] * * * covers the western end of Umatilla County, which is Hermiston [and] the small communities around [Hermiston] * * * [and] the eastern end of Morrow County, which includes primarily Irrigon and Boardman." Specifically, the authorized representative believed that claimant's job search should have extended to Boardman, about 30 miles from his home, Irrigon, about 17 miles from his home, and Umatilla, about 10 miles from his home.

The testimony was less clear on how this determination was made or who made it. The authorized representative testified the labor market was defined

> "Primarily by the area our office services, both for placement and unemployment purposes. * * * [However, we] service the Heppner area as well, but we do not consider that a part of the labor market area for normal placement activity.
>
> "* * * * *
>
> "* * * the Boardman area is a major source of employment. It is becoming heavily industrialized. It does not have a supporting populace to provide employment for the employers out there. There is a great deal of commuting, back and forth, between the Hermiston—Boardman area. This is why we have declared that people must be available and willing to accept work throughout this entire area, even though we acknowledge it is a large geographic area.
>
> "* * * * *
>
> "We service employers from as far away as Arlington, across the river in Washington, but [we do not consider that part of the labor market] because

[498]

after a point—I guess it's a common-sense point, we figure commuting is difficult, or not advantageous."

As to who defines a labor market, at one point the authorized representative testified that was done by "our central office," presumably meaning the Employment Division in Salem; at another point she said that was done by "the local office manager, the area supervisor"; and at yet another point she said that the major employers who use the Hermiston local office for placement services "primarily determine it [*i.e.*, the relevant labor market]."

The referee apparently believed that he had authority to define claimant's labor market. He first made what is labeled a "finding of fact": "The labor market to which claimant is attached includes, in addition to Stanfield and Hermiston, Echo, Umatilla, Irrigon, and Boardman." The referee then discussed this point as follows:

"The finding, above, that claimant's labor market extends 30 miles to Boardman is based on the qualified testimony of the local office representative. As suggested by claimant's brief, some of that testimony was inaccurate or inartfully articulated. The labor market does not depend, for example, on the location of the local office; the office's site is, at least in part, dictated by the location of the labor force in the market. And the local office does not establish the labor market area. But it does define it: agency employees living and working in the area, dealing continually with employees and employers in the area, identify the area within which local residents commonly seek and accept work and within which employers expect to find their workers.

"In addition to that qualified testimony, the referee would be willing to take notice of the same extent of claimant's labor market area as a fact within his specialized knowledge (his knowledge as an Employment Division referee who must acquaint himself with distance commonly travelled by the area's workers. See OAR 471-40-025.)"

We cannot tell what the referee meant by "qualified

testimony." We cannot tell what part of the local office representative's testimony the referee regarded as "inaccurate." We do not understand the distinction the referee drew between "establishing" a labor market and "defining" a labor market. And we have doubts about the propriety of taking official notice of the extent of a labor market.

The Employment Appeals Board majority stated: "We find that the referee's decision is correct, proper and complete and hereby adopt it as our own with respect to this matter." One member filed a dissent, the essence of which was:

> "* * * nearly half of any gross wage the claimant might expect to earn would be expended in transportation alone to reach the farthest reaches of his labor market as required by the majority's decision. The transcript quite clearly establishes there were plenty of potential employers (restaurants and service stations) within the area the claimant was actually searching during the weeks in issue. The claimant's labor market area was sufficiently large to demonstrate a genuine attachment to the labor force. While there may have been some individuals who lived in the claimant's area who were employed at the farthest reaches of the labor market for the area there has been absolutely no indication in this record that any of those individuals were employed at the minimum wage. Defining a labor market is simply another way of defining what is expected of an individual in order to show a genuine attachment to the labor force. If an individual is expecting to command a high wage, it is reasonable to expect him to search a wider labor market area on a geographic scale in order to find work at that wage level. If a claimant, like this claimant, can only expect to obtain a minimum wage for his work, it is unreasonable to expect him to define his labor market area or to have it defined for him in such a way that the transportation costs that might normally be expected would deprive him of the fruits of his labor * * *."

From these various approaches, we note that the concept "labor market," on the facts of this case,

presents a significant policy question: is it to be defined situationally, based on the circumstances of an individual claimant, or is it to be defined the same for all potential claimants in a given area regardless of their individual circumstances? Other eligibility standards have been defined situationally. Generally a claimant need only be seeking "the type of work the individual is most capable of performing due to prior job experience and training." OAR 471-30-036(1). The various decisionmakers in this case supplied their own individual answers to whether "labor market" should likewise be defined situationally. The local office, referee and Board majority said "no." The Board dissenter said "yes."

"An administrative agency cannot properly perform its duty under the law unless employees at all levels work toward the same objectives under a clear direction of policy from the head of that agency." *Sun Ray Dairy v. OLCC, supra*, 16 Or App at 71-72. Under *McPherson* it is not for us to resolve the policy involved in defining a labor market; nor is it for the Employment Appeals Board; nor is it for the referee. Instead, that responsibility rests with the Employment Division. 285 Or at 546-47, 551. It is understandable, but impermissible, for those that do not have policymaking authority to fill the policy void with their own ideas of what policy should be. That need not occur if Employment Division policy is promulgated in rule form.

We also require that the rules adopted contain reasonable specificity. We do not require that the Employment Division be sufficiently prophetic to foresee every possible policy question that can arise in all unemployment compensation cases and supply an answer by rule; unique situations will create unusual questions that necessarily will have to be resolved on a case-by-case basis.[1] But there is nothing unique or

---

[1] *See Sun Ray Dairy v. OLCC*, 16 Or App 63, 74, 517 P2d 289 (1973):

"We do not require the impossible. We require that the agency formulate and publish the broad bases upon which decisions regarding

unusual about the concept "labor market." It is central to the rules stated in OAR 471-30-036 and conceivably could be germane to each and every unemployment compensation claim.

We conclude that OAR 471-30-036 is not sufficiently specific in that it fails to state who has responsibility to define a claimant's labor market, by what procedure that determination is made, and, most importantly, by what standards that determination is made. In sum, our present conclusion regarding "labor market" is the same as our prior conclusion in *McCann v. OLCC, supra,* 27 Or App at 501-502, regarding another agency's use of the standard "trading community:"

> "The problem is not in the adoption of the phrase 'trading community' [or labor market], for it seems to be a reasonable concept. Nor is it in the failure to adopt mathematical standards for the application of that concept, for that would be impossible. The problem is in the failure to define 'trading community' [and labor market] in terms which inform the [agency] staff, the applicant and others of the pur-

issuance of liquor licenses will be made. To use an example pertinent to this case, if the commission wishes to restrict the issuance of Class B Package Store licenses to 'grocery stores,' it should (a) state that criterion in a published administrative regulation which has run the gauntlet of notice, hearing and publication under the Administrative Procedures Act; and (b) go on to define in a meaningful way what is meant by that term within the statutory purpose. Definitions need not be so meticulous as to be unworkable. *Board of Medical Examiners v. Mintz,* 233 Or 441, 447, 378 P2d 945 (1963). For instance, the commission need not and, indeed, probably should not specify the precise volume of frozen creamed peas, beef stew, weiners, chili, pork and beans or oats which the store must stock to qualify. On the other hand, we see no major difficulty in the commission's formulating guidelines which may appear to the commission to be factors in the determination of whether denial of a license to a given store is within 'the public interest or convenience.' Similarly, if certain criteria are more or less important than others, that fact should also be articulated. In this case, for example, the commission's director of licensing testified that the number of outlets in the applicant's area is not very important (at least to him) and that the important factor is whether the store is a 'legitimate grocery store.' If his belief accurately reflects commission policy, such a priority should be set out in published form for the guidance of applicants and agency personnel alike."

[502]

poses to be achieved in the application of the concept to varying fact situations * * *. Adoption of 'trading community' [and labor market] may be a proper beginning, but it is insufficient to accomplish that end."

## VI

*McPherson* was decided on March 20, 1979. On April 30, 1979 the Employment Division adopted temporary rules that state agency policy on some of the most frequently recurring issues in unemployment cases. We assume that claims made or processed after April 30 can be decided on the basis of the temporary rules to the extent that those rules address the relevant issues.

The question remains of what to do with cases like this one that arose before *McPherson* or more recent claims involving issues that the temporary rules do not resolve. *McPherson* forecloses us from defining "labor market." Without any administrative standard or definition, it is impossible for us to review for substantial evidence. Therefore, we reverse and remand to the Employment Division with instructions to reconsider claimant's eligibility for unemployment compensation for the weeks in issue only after it has adopted reasonably specific rules stating agency policy within its area of responsibility under *McPherson* and this opinion.

Reversed and remanded for further proceedings consistent with this opinion.