Argued and submitted March 11, affirmed in part, reversed in part and remanded
August 3, 1983

# GOODERHAM et al,
*Petitioners,*

*v.*

# ADULT & FAMILY SERVICES
# DIVISION et al,
*Respondents.*

(4-2801-0ZL798-1, 2-2801-OZJ759-3,
5-2801-MLI873-8, 1-2801-MXO597-0; CA A22289)

667 P2d 551

L. Ramsay Weit, Legal Aid Service, Portland, argued the cause and filed the briefs for petitioners.

William F. Nessly, Jr., Assistant Attorney General, Salem, argued the cause for respondents. With him on the brief were Dave Frohnmayer, Attorney General, Stanton F. Long, Deputy Attorney General, and William F. Gary, Solicitor General, Salem.

Before Richardson, Presiding Judge, and Van Hoomissen and Newman, Judges.

RICHARDSON, P. J.

### RICHARDSON, P.J.

Petitioners are four public aid recipients, who before September 1, 1980, were receiving "special diet allowances" as part of their public assistance grants. Pursuant to former OAR 461-06-015, Adult and Family Services Division (AFSD) provided supplemental assistance to help pay for a broad range of special diets for which there was verification of medical need. Petitioners appeal final orders of AFSD terminating or reducing their special diet allowances as of September 1, 1980. We reverse and remand.

In mid-1980 AFSD revised its "Special Diet Program." An internal AFSD memorandum dated July 31, 1980, and titled "Executive Letter 80-54" stated in part:

"Most special diet allowances formerly approved by the branch or by Health and Social Services will no longer be available. Additional funds will be provided only for those special diets which (a) are medically necessary; and (b) involve increased cost. The following is a list of the diets that meet these criteria and examples of some of the conditions for which they are required. This list was developed with the participation of an Oregon Medical Association appointed advisory task force which included physician and registered dietician representation."

Four categories of diets were described. The Executive Letter stated that existing special diet allowances would automatically be removed from the assistance grants on September 1, 1980, except those falling into one of the four categories. On August 22, 1980, AFSD filed a temporary rule amending OAR 461-06-015 to state:

"Special diet allowances may be added to the grant when prior approval has been obtained from the Health and Social Services Section of Adult and Family Services Division. Only special diets for medical conditions specified by the Division shall be submitted for consideration."

A table of special diets formerly incorporated in the rule was eliminated. The particular diets that would qualify for allowances under the new rule were not listed in the rule, but were only specified in the Executive Letter.

Three of the petitioners had their allowances terminated as of September 1, 1980, and petitioner Benson's diet

allowance was reduced from $33 to $18, because she was eventually determined to be eligible under one of the new categories. After a consolidated hearing, AFSD, on August 21, 1981, affirmed its decision to terminate the allowances of the three petitioners and to reduce Benson's. The cases were decided according to the criteria specified in the Executive Letter. Petitioners argued that the rule was invalid and that the unpublished criteria could not be applied to them.

After petitioners filed for judicial review, AFSD withdrew its order for reconsideration pursuant to ORS 183.482(6).[1] AFSD then filed a "Notice of Proposed Rule Making" on February 19, 1982, indicating its intent to make a permanent amendment to OAR 461-06-015. The proposed rule set out the criteria contained in Executive Letter 80-54. The rule was adopted March 17, 1982, with an added clause making it retroactive to September 1, 1980. On March 10, 1982, a new hearing was conducted, at which the text of the proposed rule and the notice were offered as evidence. A final order terminating the diet allowances of three petitioners and reducing Benson's was issued March 24, 1982.[2] Petitioners argue that the invalidity of the 1980 temporary rule cannot properly be cured by application of the 1982 retroactive rule and that the rule violates the federal Food Stamp Act.

■ AFSD concedes that the 1980 rule was defective in that it did not specify the criteria of eligibility to be applied under the rule and essentially concedes that it was therefore invalid.[3] We agree. The criteria applied in the first hearing

---

[1] With respect to the procedure for review of contested cases, ORS 183.482(6) provides:

"At any time subsequent to the filing of the petition for review and prior to the date set for hearing the agency may withdraw its order for purposes of reconsideration. If an agency withdraws an order for purposes of reconsideration, it shall, within such time as the court may allow, affirm, modify or reverse its order. If the petitioner is dissatisfied with the agency action after withdrawal for purposes of reconsideration, he may file an amended petition for review and the review shall proceed upon the revised order."

[2] We do not comment on the appropriateness under ORS 183.482(6) of withdrawing an order to amend the rule it applied.

[3] AFSD states in its brief:

"* * * By its withdrawal and subsequent actions with regard to the orders in this case, respondents have all but admitted that petitioners are correct in their attack upon the initial temporary rule. * * *"

were set out in the Executive Letter, which was placed in the agency's manual but which had not been promulgated pursuant to APA rulemaking procedures. *See Ortiz v. Adult & Family Services Division,* 45 Or App 925, 609 P2d 1309 (1980).[4]

■　　　　　Petitioners argue that the permanent rule adopted March 17, 1982, could not be used to cure the invalid rule and reduce or terminate their benefits as of September 1, 1980. We agree and conclude that the retroactivity clause of the rule is invalid.

Oregon courts have had little occasion to consider the validity of retroactive rules. We therefore turn to other authorities for assistance.

As in the case of a statute, a retroactive rule is not *per se* invalid. Davis, 2 Administrative Law Treatise 109, § 7:23 (2nd ed 1979); *see also Hall v. Northwest Outward Bound School,* 280 Or 655, 572 P2d 1007 (1977). The test of the validity of retroactive application of rules has been expressed as one of reasonableness:

> "Like retroactive statutes, retroactive rules are valid if they are reasonable but are invalid if their retroactivity is unreasonable in the circumstances * * *." Davis, *supra,* at 109.

*See also Public Serv. Co. of Colorado v. Andrus,* 433 F Supp 144 (DDC 1977); *General Telephone Co. of Southwest v. United States,* 449 F2d 846, 863 (5th Cir 1971).

In *Securities Comm'n v. Chenery Corp.,* 332 US 194, 67 S Ct 1575, 67 S Ct 1760, 91 L Ed 1995 (1947), the Supreme Court stated:

> "* * * [S]uch retroactivity must be balanced against the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles. If that mischief is greater than the ill effect of the retroactive application of a new standard, it is not the type of retroactivity which is condemned by law. * * *" 332 US at 203.

A frequently cited elaboration of the *Chenery* balancing test is found in *Retail, Wholesale and Department Store U. v. N.L.R.B.,* 466 F2d 380, 390 (DC Cir 1972):

---

[4] Petitioners do not contend that the rule was adopted in violation of the requirements for temporary rulemaking, ORS 183.335(5).

"Among the considerations that enter into a resolution of the problem are (1) whether the particular case is one of first impression, (2) whether the new rule represents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of law, (3) the extent to which the party against whom the new rule is applied relied on the former rule, (4) the degree of the burden which a retroactive order imposes on a party, and (5) the statutory interest in applying a new rule despite the reliance of a party on the old standard. * * *"[5]

*See, e.g., Maceren v. District Dir., I. & N. Serv., Los Angeles, Cal.,* 509 F2d 934, 939-40 (9th Cir 1974); *Gonzales-Blanco v. Clayton,* 110 Ill App 3d 197, 65 Ill Dec 794, 441 NE2d 1308, 1314 (1982). We conclude that retroactive application of the 1982 rule is unreasonable in its prejudice to petitioners.[6]

We first note the nature of petitioners' interest. In *Goldberg v. Kelly,* 397 US 254, 90 S Ct 1011, 25 L Ed 2d 287 (1970), the Supreme Court, noting that welfare benefits constitute a statutory entitlement for eligible recipients and "the

---

[5] The court in *Chenery* considered whether an agency with rulemaking power should be permitted to announce a new rule in the process of adjudication. Although *Chenery* and *Retail, Wholesale* concerned the retroactive effect of rules developed through adjudication, their formulations have been frequently used in the evaluation of the retroactivity of rules adopted through rulemaking. *See, e.g., Maceren v. District Dir., I. & N. Serv., Los Angeles, Cal.,* 509 F2d 934 (9th Cir 1974); *City of Salem v. Noble,* 45 Or App 453, 608 P2d 603 (1980).

[6] Petitioners do not specifically argue that the regulation violates the Due Process Clause or is otherwise unconstitutional. *See, generally, Hall v. Northwest Outward Bound School,* 280 Or 655, 572 P2d 1007 (1977); *United States Trust Co. v. New Jersey,* 431 US 1, 97 S Ct 1505, 52 L Ed 2d 92 (1977). The constitutional tests may involve considerations similar to the *Chenery* test. *See, e.g., Adams Nursing Home of Williamstown, Inc. v. Mathews,* 548 F2d 1077, 1080 (1st Cir 1977) (compare public interest in retroactive rule with private interests overturned by it); *United States Trust Co. v. New Jersey, supra,* 431 US at 17, n 13; *Hazelwood Chronic & Conv. Hosp. v. Weinberger,* 543 F2d 703, 708 (9th Cir 1976), *vacated and remanded on other grounds,* 430 US 952 (1977) (whether retroactive effects are so wholly unexpected and disruptive that harsh and oppressive consequences follow). Another test is from *Bradley v. Richmond School Board,* 416 US 696, 717, 94 S Ct 2006, 40 L Ed 2d 476 (1974), in which the Supreme Court stated that laws would not be given retroactive effect if the application would result in "manifest injustice." Three factors are considered in this determination:

"* * * (a) The nature and identity of the parties, (b) the nature of their rights, and (c) the nature of the impact of the change in law upon those rights."

This test appears to be a rule of construction for situations in which the statute or rule is not retroactive by its terms. Differing purposes of the above tests are not always distinguished by the courts.

very means by which to live," held that the strong interest in avoiding deprivation of benefits to eligible recipients compelled the due process requirement of a pre-termination hearing. It is in the context of the special status of need-based government benefits that we consider the validity of the deprivation of public assistance benefits by adoption of a retroactive regulation governing eligibility.

At first blush, petitioners' reliance on the former rule appears minimal under the circumstances. AFSD cites *Daughters of Miriam Ctr. for the Aged v. Mathews,* 590 F2d 1250, 1252 (3rd Cir 1978), for the proposition that a central question in the analysis is how the party's conduct would have differed had the rule been applied from the start. AFSD contends that the regulation at issue here does not impose a sanction for past behavior or deny eligibility on the basis of some act that petitioners could have performed had they known. AFSD states:

> "* * * In short, petitioners' expectations had a footing no firmer than the mere hope that an existing program would continue indefinitely into the future.

However, we conclude that petitioners' reliance on the old rule does suffice to render the retroactivity of the rule unfair. Because the 1980 version of OAR 461-06-015 was invalid, the previous rule remained in effect. A rule not promulgated according to the APA is not a rule. *Burke v. Children's Serv. Div.,* 26 Or App 145, 552 P2d 592 (1976). The 1980 rule thus was not effective to repeal the previous rule. It could not provide a legal basis for terminating benefits. *See Ortiz v. Adult & Family Services Division, supra,* 45 Or App at 929.[7] Although their benefits had in fact been discontinued or reduced, petitioners qualified for benefits under the original rule until new criteria of eligibility were validly promulgated. It is true that petitioners' special diet allowances had already been terminated or reduced on September 1, 1980, and that the new regulation merely attempted to legitimize the action that had already been taken, under criteria that had already

---

[7] AFSD does not contend that the invalid rule was severable so that it was effective to repeal the prior rule without enacting any new conditions qualifying anyone for special diet allowances. From this concession, as well as the language of the rule, we conclude that the 1980 rule did not repeal the previous one.

appeared in the agency manual. However, to allow our consideration of the reasonableness of the 1982 retroactive regulation to take into account the invalid 1980 rule would be to allow the invalid regulation effect. We consider the facts of this case as if the 1982 regulation purported to deprive petitioners of benefits that they had already actually received. The retroactive application of the regulation is clearly prejudicial and unreasonable when viewed in that light. Their entitlement to benefits during the period preceding the adoption of the 1982 retroactive rule constitutes a sufficient reliance interest to render unreasonable the application of the 1982 rule to them as of September 1, 1980.

AFSD asserts its statutory interest in the proportionate allocation of limited funds under ORS 411.130.[8] We do not find that interest to outweigh the prejudice to petitioners. The agency's interest in its goals under ORS 411.130 could have been protected through a valid prospective rule at any time, including an emergency rule under the procedure specified in ORS 183.335(5). *See Gray Panthers v. Pub. Wel. Div.,* 28 Or App 841, 845, n 3, 561 P2d 674 (1977); *Burke v. Children's Serv. Div., supra,* 26 Or App at 152, n 2. In considering the statutory interest in retroactive deprivation of benefits, the public assistance program's remedial purpose is also significant.

AFSD also argues that the retroactive curing of the invalid rule accomplished a result no different from the result obtained in cases involving rules that were invalid for lack of specificity where the court has remanded for reconsideration under new standards., *See, e.g., McPherson v. Employment Division,* 285 Or 541, 591 P2d 1381 (1979); *Oliver v. Employment Division,* 40 Or App 487, 595 P2d 1252 (1979). However, none of the cases cited directly considered the problem of

---

[8] ORS 411.130 provides:

"The division, taking into consideration the total amount of funds available for public assistance in Oregon during the biennial period beginning July 1 of each odd-numbered year, the estimated number of beneficiaries in each category thereof, current and estimated costs of essential needs to maintain a standard of living during such period compatible with decency and health and such other matters as it may deem pertinent, shall estimate and allocate the funds available for each category of public assistance on a monthly basis subject to the quarterly revisions. Changes in such allocations, if any, shall be uniform and, as nearly as practicable and considering the above factors, proportionately equal in each such category. The monthly amounts so found estimated and allocated shall be deemed to be the funds available for each category for public assistance in Oregon."

retroactivity, and none involved the retroactive deprivation of public assistance benefits to which the recipient was clearly entitled before announcement of the new rule.[9] We therefore find that the rule cannot be applied retroactively to the period preceding its effective date.

■     This determination does not end our inquiry, because the order appealed from addresses petitioners' entitlement to special diet allowances after the effective date of the 1982 rule. Thus we must consider petitioners' other challenge to the rule's validity: that it violates the federal Food Stamp Act, 7 USC § 2011 *et seq.* Under ORS 411.837 the agency must comply with federal laws and regulations applicable to food stamp plans. We note first that this question can only affect petitioner Benson, who continues to qualify for special diet allowances under the 1982 rule; it is a moot issue with respect to the petitioners whom the new rule disqualifies. Petitioner Benson received a smaller amount under the 1982 rule because of the new method of calculating benefit levels.

Petitioners argue that the new rule violates the federal Food Stamp Act because availability of food stamps is taken into account in determining the benefit level. They argue that this procedure conflicts with 7 USC § 2017(b), which provides:

> "The value of the allotment provided any eligible household shall not be considered income or resources for any purpose under any Federal, State, or local laws, including, but not limited to, laws relating to taxation, welfare, and public assistance programs, and no participating State or political subdivision thereof shall decrease any assistance otherwise provided an individual or individuals because of the receipt of an allotment under this chapter."

Under the rule promulgated March 17, 1982,

> "[t]he amount of a special diet allowance shall not exceed the difference between the amount provided in the basic standard for food and the actual cost of the special diet as determined by the Senior Services Division." OAR 461-06-015(4).

_____

[9] We do not comment here on whether the remand procedure used in *McPherson* and *Oliver* has continued vitality after *Ortiz v. Adult & Family Services Division,* 45 Or App 925, 609 P2d 1309 (1980).

How "the actual cost of the special diet" is determined is spelled out elsewhere. The "Notice of Proposed Rule Making" filed August 20, 1980, stated in part:

"* * * To limit special diet expenditures, allowances will be paid only for selected diets which cost more than the total of the food standard in the assistance program * * * plus the average food stamp allotment for one person in that assistance program."

This procedure was explained:

"In an effort to establish the amount of financial assistance to be paid for those special diets approved after September 1, 1980, AFS added a weighted average of the food stamp bonus value for each class of recipients (ADC, GA, OAA, etc.) to the weighted average of the food allowance for this same class to establish a floor figure. Diets costing more than this floor figure would be the only diets paid by the agency under the new special diet program, and payments would be in the amount that that diet exceeded the floor figure set by adding the two weighted averages. * * *" (Agreed Narrative Statement in Lieu of Deposition)

Thus, public assistance recipients with special dietary needs can only receive special diet allowance to the extent that the special diet would cost more than the average amount for food already provided those who also receive food stamps.

Adult and Family Services contends that the rule does not violate 7 USC § 2017(b), because it does not reduce a recipient's special diet allowance based on the fact that *that individual* receives food stamps. Instead, AFSD argues, it has borrowed figures from the food stamp program as an aid to estimating the cost of a minimally adequate diet in order to determine whether extra funds will be required to pay for the special diet. The agency points out that on its face the rule does not distinguish between individuals actually receiving food stamps and those not doing so.

It is clear that a reduction in public assistance because of an individual's receipt of food stamps is prohibited by the statute. In *Dupler v. City of Portland,* 421 F Supp 1314 (D Maine 1976), the amount general assistance recipients were allotted for food in their public assistance grants was only the amount that it cost the individual to purchase food stamps. The federal court found that their general assistance grants

had been decreased illegally.[10] A California state appeals court has gone further, invalidating public assistance benefit levels that were based on *probable eligibility* for food stamps. *Long v. City and County of San Francisco,* 78 Cal App 3d 61, 144 Cal Rptr 64 (1978). The value of food stamps was taken into account in determining public assistance benefit levels without reference to whether a particular individual was actually receiving food stamps. The court specifically rejected the argument that the aid levels were permissible because they did not discriminate between those actually receiving stamps and those not receiving them.

> "* * * The purposes for the Food Stamp Act were to improve the nutrition of low-income families (*Dupler, supra,* at p. 1318) and to strengthen the agricultural economy (see 1964 U.S. Code Cong. & Admin. News, pp. 3275-3292). If a municipality could set its relief standards by reference to food stamp availability, both of these goals could be thwarted. As in the *Dupler* case, a recipient's food expenses could be kept constant by the simple expedient of reducing welfare grants to the extent of the food stamp subsidy. With constant food expenditures the recipient's nutrition would not improve and the agricultural economy would not be stimulated.

> "Appellants here have even gone a step beyond *Dupler.* Not only do food stamp recipients receive no benefit from the stamps, but those who do not have food stamps have their food allotments set at the level of the food stamp recipients. * * *" 78 Cal App 3d at 70. (Footnote omitted.)

In 1977, when 7 USC § 2017(b) was enacted, the House committee report stated:

> "The bill makes crystal clear current law preventing state or local governments from reducing benefits provided food stamp recipients under other laws (Federal, state, or local, but especially general assistance) because of their receipt of food stamps. *See Dupler v. City of Portland * * * Long v. City and County of San Francisco,* Civil Action #689-927 (Cal. Sup. Ct.

---

[10] At the time of *Dupler,* the applicable statute was 7 USC § 2019(d), which provided:

> "Participating States or participating political subdivisions thereof shall not decrease welfare grants or other similar aid extended to any person or persons as a consequence of such person's or persons' participation in benefits made available under the provisions of this chapter or the regulations issued pursuant to this chapter."

The current language was substituted in 1977.

1977) \* \* \*." H. R. Rep. No. 95-464, 95th Cong., 1st Sess. 247, reprinted in 1977 US Code Cong. and Ad. News 1978, 2191.

Thus, although the California Court of Appeals' opinion had not yet issued, the citation to the lower court opinion in *Long* indicates that the restriction was not intended to be limited to reduction of benefits because of *actual* receipt of food stamps. We agree that it would thwart the purposes of the Food Stamp Act to interpret 7 USC § 2017(b) to permit the use of food stamp benefit levels to decrease assistance to all special diet allowance recipients.

AFSD also argues that the regulation does not on its face conflict with 7 USC § 2017(b). However, the statute does not merely make illegal state *statutes and rules* lowering benefits because of receipt of food stamps, but rather says that the state cannot *decrease assistance* otherwise provided because of the food stamp allotment. *Cf. Foster v. Center Tp. of LaPorte County,* 527 F Supp 377 (ND Ind), *aff'd* 673 F2d 1334 (7th Cir 1981) (judgment inappropriate because there was a question of fact whether availability of food stamps was the reason for the reduction in public assistance benefit levels.)[11] Thus, AFSD should not have reduced or terminated any of petitioners' special diet allowances until the adoption of the valid regulation, March 17, 1982. Further, petitioner Benson's reduction after that date was invalid to the extent that the new rule was in violation of the Food Stamp Act.

The portions of the order terminating or reducing the special diet allowances of petitioners as of September 1, 1980, is reversed. The termination of the allowances as of the effective date of the 1982 rule is affirmed. To the extent that the rule permits utilization of food stamp allotments in determining the amount of the special diet allowance contrary to 7 USC § 2017(b) and ORS 411.837, it is invalid. The order reducing

---

[11] AFSD cites *Smith v. Dept. of Public Aid,* 67 Ill 2d 529, 10 Ill Dec 520, 367 NE2d 1286 (1977). The Illinois Supreme Court found that the state assistance program did not violate the Food Stamp Act. The petitioners had argued that the net benefit of their assistance was decreased when new categories of income were considered in determining the price of their food stamps. The facts differ significantly from those here. The Illinois court distinguished *Dupler v. City of Portland,* 421 F Supp 1314 (D Maine 1976), in part on the ground that Illinois "makes no distinction in its granting of welfare between food stamp recipients and those who do not receive food stamps." 67 Ill 2d at 538. We do not find this language to control the issue in this case. *See Long v. City and County of San Francisco, supra,* 78 Cal App 3d at 70, n 1.

the allowance of petitioner Benson is remanded for recalculation of the amount of the special diet allowance.

Affirmed in part; reversed in part; and remanded for further proceedings not inconsistent with this opinion.