Argued and submitted May 8, affirmed on petition of Eugene Sand & Gravel; reversed and remanded for reconsideration on cross-petitions; Thistledown Farms' motion to dismiss Oregon Concrete and Aggregate Producers Association's petition for judicial review allowed July 30, 2003

EUGENE SAND & GRAVEL,
*Petitioner - Cross-Respondent,*

*and*

OREGON CONCRETE AND AGGREGATE
PRODUCERS ASSOCIATION,
*Petitioner - Cross-Respondent,*

*v.*

LANE COUNTY,
Thistledown Farm,
and Lone Pine Farms, Ltd.,
*Respondents - Cross-Petitioners,*

*and*

Karen REED,
*Respondent below.*

2002-068; A120975

74 P3d 1085

■■■■■■■■■■

Steven L. Pfeiffer argued the cause for petitioner - cross-respondent Eugene Sand & Gravel. With him on the opening brief were Frank M. Flynn, Roger A. Alfred, and Perkins Coie LLP. With him on the reply brief were Frank M. Flynn and Perkins Coie LLP.

Frank M. Parisi argued the cause for petitioner - cross-respondent Oregon Concrete and Aggregate Producers Association. With him on the briefs was Timothy S. "Todd" Sadlo.

Stephen L. Vorhes argued the cause and filed the brief for respondent - cross-petitioner Lane County.

Daniel J. Stotter argued the cause and filed the brief for respondent - cross-petitioner Thistledown Farm.

Lee D. Kersten argued the cause and filed the brief for respondent - cross-petitioner Lone Pine Farms, Ltd.

Before Haselton, Presiding Judge, and Deits, Chief Judge,* and Linder, Judge.

HASELTON, P. J.

■■■■■■■■■■

Thistledown Farms' motion to dismiss Oregon Concrete and Aggregate Producers Association's petition for judicial review is allowed.

---

\* Deits, C. J., *vice* Wollheim, J.

## HASELTON, P. J.

Petitioners Eugene Sand & Gravel and Oregon Concrete and Aggregate Producers Association (OCAPA) petition for judicial review of an order of the Land Use Board of Appeals. That order affirmed in part and remanded in part respondent Lane County's denial of petitioner Eugene Sand & Gravel's application to amend Lane County's comprehensive plan to add 575 acres to its inventory of aggregate sites and to permit mining on a portion of that acreage. Respondents Lane County, Thistledown Farm, and Lone Pine Farms cross-petition for review of that order. For the reasons set forth below, we dismiss OCAPA's petition, affirm on Eugene Sand & Gravel's petition, and reverse and remand on the cross-petitions.

For purposes of our review, the relevant facts are not in dispute. The property at issue, which borders the Willamette River, is zoned for exclusive farm use and is within a flood plain. Historically it has been used for agricultural and forest purposes. A portion of the property's western boundary is at River Road, and the property's northern boundary is at Lone Pine Drive. The property contains a significant amount of alluvial aggregate. Petitioner Eugene Sand & Gravel wishes to use a portion of the property to mine and process aggregate and conduct related activities involving the production of concrete and asphalt. It intends to gain access to the property from River Road.

The property is surrounded by land used for agricultural and rural residential purposes and is near an area designated as sensitive bird habitat. Respondents Thistledown Farm and Lone Pine Farms are located near the property. Both sell produce at farm stands, which can be reached from River Road. Lone Pine Farms also has a conditional use permit to conduct other commercial activities, including selling local crafts and conducting seasonal festivals.

In April 2000, Eugene Sand & Gravel submitted an amended application to amend Lane County's comprehensive plan to add the property to the inventory of aggregate sites, to rezone the property, and to permit mining on a portion of the property. The planning commission determined

that the property did contain significant aggregate resources and thus should be included in the county's inventory of aggregate sites, but concluded that mining should not be permitted because of noise, dust, and traffic conflicts that could not be minimized. The commission further concluded that the mining would conflict with agricultural practices on adjacent and nearby farms. It therefore recommended to the Lane County Board of Commissioners (county) that the application be denied.

The county denied the application, making extensive findings. As pertinent here, the county found that the property was a significant Goal 5 mineral and aggregate resource, *see* OAR 660-023-0180(3), but that the application did not meet all of the conflict minimization requirements of OAR 660-023-0180(4). In particular, the county found that, while certain conflicts could be minimized under the standards set forth in OAR 660-023-0180(4), certain conflicts resulting from flooding discharges and impacts on riparian resources could not be minimized under that rule. The county further noted that the rule provided that conflicts with agricultural practices were to be evaluated under the standards set forth in ORS 215.296.[1] It further found that conflicts with agricultural practices from the proposed mining would result from the generation of dust, the lowering of groundwater resources, increased flooding, and traffic impacts. In its consideration of conflicts with agricultural practices, the county considered the effect that the proposed mining operation would have on farm stands,[2] and concluded that it would have a negative impact on them. Ultimately, the county denied the application on the ground that the benefits of allowing the mining would not outweigh the impacts of the identified conflicts.

---

[1] ORS 215.296(1) provides, in part, that certain uses may be approved only where the governing body finds that the uses will not "[f]orce a significant change in accepted farm or forest practices on surrounding lands devoted to farm or forest use; or * * * [s]ignificantly increase the cost of accepted farm or forest practices on surrounding lands devoted to farm or forest use."

[2] The county considered the farm stand activities to be agricultural practices only insofar as they involved "the sale of produce grown on the farm properties." It did not consider Lone Pine Farms's other commercial conditional uses to be agricultural practices for purposes of its application of OAR 660-023-0180(4).

Eugene Sand & Gravel petitioned LUBA for review of the county's final order. OCAPA intervened and also petitioned for review of the order. Eugene Sand & Gravel and OCAPA argued that the county erred in analyzing the conflicts between the proposed mining and agricultural practices in a different manner than the county analyzed the conflicts with other activities, and that the county erred in concluding that the conflicts with agricultural practices could not be minimized. They also argued that the county erred in considering the impacts that the mining would have on farm stands. In particular, Eugene Sand & Gravel and OCAPA asserted that farm stands do not constitute "agricultural practices" for purposes of OAR 660-023-0180(4)(b)(E). Finally, they asserted that, even if the county were correct in applying a different standard for conflicts with agricultural practices, the county's findings were insufficient to support its conclusions.

LUBA agreed with the county that conflicts with "agricultural practices" needed to be evaluated under the standards set forth in ORS 215.296(1). LUBA also rejected petitioners' arguments that the county's findings, in general, were insufficiently detailed to meet the standards set forth by this court in *Commonwealth Properties, Inc. v. Washington County*, 35 Or App 387, 582 P2d 1384 (1978). However, LUBA agreed with petitioners that farm stands could not be considered "agricultural practices." LUBA also concluded that, as petitioners urged, certain of the county's findings with respect to riparian resources and wetlands were inconsistent with one another.[3] LUBA therefore affirmed in part but remanded the case to the county for reconsideration of the issues described above.

Eugene Sand & Gravel and OCAPA petitioned for judicial review, and the county, Thistledown Farm, and Lone Pine Farms cross-petitioned for review. As an initial matter, we must address standing. The county, in its respondent's brief, suggests that petitioner OCAPA has failed to establish that a justiciable controversy exists as to it, citing *Utsey v. Coos County*, 176 Or App 524, 32 P3d 933 (2001), *rev dismissed*, 335 Or 217 (2003). Respondent Thistledown Farm

---

[3] LUBA's conclusion in that regard is not at issue on review.

moves to dismiss OCAPA's petition for judicial review on the same ground. We turn then to the threshold question of whether OCAPA had standing to petition for review of LUBA's order in this case.

■ In *Utsey*, we concluded that the League of Women Voters, a party that had appeared as an intervenor before LUBA, had satisfied the statutory requirements for intervening in the case but nonetheless lacked standing to petition this court for review of LUBA's order because it did not demonstrate that a decision would have a "practical effect" on its rights. *Id.* at 550. OCAPA—at least insofar as the record before us shows—is in the same position as was the League of Women Voters in *Utsey*. The record does not demonstrate that a decision in this matter would have a practical effect on OCAPA's rights. We thus conclude, based on the considerations set forth at length in *Utsey*, that OCAPA's petition for judicial review is not justiciable.

OCAPA has, however, moved for leave to appear as *amicus curiae* in support of petitioner Eugene Sand & Gravel's petition for judicial review and to have its briefs considered by the court in that capacity. We allow the motion for leave to appear as *amicus curiae*. Given OCAPA's status, we will consider the arguments made by OCAPA in its briefs only insofar as they concern assignments of error raised in Eugene Sand & Gravel's petition for judicial review and respondents' cross-petitions for judicial review.

In its first three assignments of error in its petition for judicial review, Eugene Sand & Gravel (petitioner)[4] focuses on the meaning of the term "significant conflicts" as used in OAR 660-023-0180(4)(d) and the adequacy of the county's findings concerning "significant conflicts" under that rule. We affirm LUBA's decision on petitioner's first three assignments of error without discussion. Petitioner also asserts that LUBA erred in determining that the county's decision was supported by substantial evidence. We reject that argument without discussion as well.

---

[4] Given our dismissal of OCAPA's petition, references to "petitioner" are only to Eugene Sand & Gravel.

In its final assignment of error, petitioner asserts that LUBA erred in failing to remand the county's decision for re-evaluation under OAR 660-023-0180(4) after concluding that farm stands are not "agricultural practices." The disposition of that assignment of error depends on the disposition of the sole issue presented by the three cross-petitions for judicial review: Did LUBA err in concluding that the operation of a farm stand cannot be an "agricultural practice" for purposes of OAR 660-023-0180(4)(b)(E) and, specifically, that the effect of the proposed mining on the farm stands here could not properly be considered as a conflict "with agricultural practices" under that rule? Accordingly, we turn to that issue as presented in the cross-petitions.

We review LUBA's legal conclusions for errors of law. ORS 197.850(9)(a). The parties' disputes concern the proper application of OAR 660-023-0180(4), which provides, in part:

"For significant mineral and aggregate sites, local governments shall decide whether mining is permitted. For a PAPA [(post-acknowledgment plan amendment)] application involving a significant aggregate site, the process for this decision is set out in subsections (a) through (g) of this section. For a PAPA involving a significant aggregate site, a local government must complete the process within 180 days after receipt of a complete application that is consistent with section (6) of this rule, or by the earliest date after 180 days allowed by local charter. The process for reaching decisions about aggregate mining is as follows:

"(a) The local government shall determine an impact area for the purpose of identifying conflicts with proposed mining and processing activities. The impact area shall be large enough to include uses listed in subsection (b) of this section and shall be limited to 1,500 feet from the boundaries of the mining area, except where factual information indicates significant potential conflicts beyond this distance. For a proposed expansion of an existing aggregate site, the impact area shall be measured from the perimeter of the proposed expansion area rather than the boundaries of the existing aggregate site and shall not include the existing aggregate site.

"(b) The local government shall determine existing or approved land uses within the impact area that will be

adversely affected by proposed mining operations and shall specify the predicted conflicts. For purposes of this section, 'approved land uses' are dwellings allowed by a residential zone on existing platted lots and other uses for which conditional or final approvals have been granted by the local government. For determination of conflicts from proposed mining of a significant aggregate site, the local government shall limit its consideration to the following:

"(A)   Conflicts due to noise, dust, or other discharges with regard to those existing and approved uses and associated activities (*e.g.*, houses and schools) that are sensitive to such discharges;

"(B)   Potential conflicts to local roads used for access and egress to the mining site within one mile of the entrance to the mining site unless a greater distance is necessary in order to include the intersection with the nearest arterial identified in the local transportation plan. Conflicts shall be determined based on clear and objective standards regarding sight distances, road capacity, cross section elements, horizontal and vertical alignment, and similar items in the transportation plan and implementing ordinances. Such standards for trucks associated with the mining operation shall be equivalent to standards for other trucks of equivalent size, weight, and capacity that haul other materials;

"(C)   Safety conflicts with existing public airports due to bird attractants, *i.e.*, open water impoundments. This paragraph shall not apply after the effective date of commission rules adopted pursuant to Chapter 285, Oregon Laws 1995;

"(D)   Conflicts with other Goal 5 resource sites within the impact area that are shown on an acknowledged list of significant resources and for which the requirements of Goal 5 have been completed at the time the PAPA is initiated;

"(E)   *Conflicts with agricultural practices*; and

"(F)   Other conflicts for which consideration is necessary in order to carry out ordinances that supersede Oregon Department of Geology and Mineral Industries (DOGAMI) regulations pursuant to ORS 517.780;

"(c)   The local government shall determine reasonable and practicable measures that would minimize the conflicts

identified under subsection (b) of this section. *To determine whether proposed measures would minimize conflicts to agricultural practices, the requirements of ORS 215.296 shall be followed rather than the requirements of this section.* If reasonable and practicable measures are identified to minimize all identified conflicts, mining shall be allowed at the site and subsection (d) of this section is not applicable. If identified conflicts cannot be minimized, subsection (d) of this section applies.

"(d)   The local government shall determine any significant conflicts identified under the requirements of subsection (c) of this section that cannot be minimized. Based on these conflicts only, local government shall determine the ESEE [economic, social, environmental, and energy] consequences of either allowing, limiting, or not allowing mining at the site. Local governments shall reach this decision by weighing these ESEE consequences, with consideration of the following:

"(A)   The degree of adverse effect on existing land uses within the impact area;

"(B)   Reasonable and practicable measures that could be taken to reduce the identified adverse effects; and

"(C)   The probable duration of the mining operation and the proposed post-mining use of the site."

(Emphasis added.)

As noted, the county applied subsection (b) of that rule and found that various conflicts existed, including numerous conflicts "with agricultural practices." Most of the identified conflicts with agricultural practices concerned the actual growing of crops or the effect of dust on animals. The county specifically identified conflicts with retail farm stands at Thistledown Farm and Lone Pine Farms and concluded:

"Portions of the retail activities conducted on the sites include the sale of produce grown on the farm properties. The Board finds that the sale of this produce from the subject farms constitutes farm use as defined by ORS 215.203(2)(a) whose conflicts must be reviewed under OAR 660-023-0180(4)(b)(E)."

In short, the county treated farm stand retail activities as "agricultural practices" for purposes of OAR 660-023-0180(4)(b)(E), insofar as those farm stand retail activities involved the sale of produce grown on the farms where the farm stands are located.

LUBA disagreed with the county's classification of the farm stands as "agricultural practices." LUBA stated:

"According to petitioners, farm stands do not fall under the definition of farm use set out in ORS 215.203(2), because the use is separately and more distinctly defined in ORS 215.213(1)(u). Petitioners concede that farm stands are permitted in an EFU zone. *See Brentmar v. Jackson County*, 321 Or 481, 900 P2d 1030 (1995) (uses listed in ORS 215.213(1) and 215.283(1) must be permitted in EFU zones). However, petitioners argue that the 'agricultural practices' that must be considered under OAR 660-023-0180(4)(b)(E) are limited to those agricultural practices listed in ORS 215.203(2)(b) and do not include ancillary activities that are allowed as permitted nonfarm uses under ORS 215.213(1).

"* * * * *

"* * * *The uses that are listed under ORS 215.213(1) and 215.283(1) are nonfarm uses. Collins v. Klamath County,* 148 Or App 515, 521, 941 P2d 559 (1997). * * *

"The legislature has chosen to differentiate between 'farm use' and 'farm stands' and 'commercial activities that are in conjunction with farm use' and place each of those uses in separate categories, subject to different levels of regulation. *See* ORS 215.203(2)(a), ORS 215.213(1)(u) and ORS 215.213(2)(c). *Uses identified as nonfarm uses under ORS 215.213(1) are not farm uses or agricultural practices that must be evaluated under OAR 660-023-0180(4)(b)(E).* Therefore, the county erred when it considered conflicts between the proposed mining activities and farm stands in concluding that OAR 660-023-0180(4)(b)(E) was not satisfied."

(Emphasis added; footnotes omitted.)

Thus, as we understand it, LUBA's conclusion that the county could not, as a matter of law, consider potential

mining-related impacts on farm stands under OAR 660-023-0180(4)(b)(E) rested on the following propositions:

> *First,* an activity cannot constitute an "agricultural practice" for purposes of OAR 660-023-0180(4) unless it meets the definition of "farm use" in ORS 215.203(2)(a).

> *Second,* all of the activities listed in ORS 215.213(1) and ORS 215.283(1), including the operation of farm stands, are, necessarily, "nonfarm" uses.

> *Third,* and consequently, because farm stands must be deemed to be "nonfarm" uses by virtue of their inclusion in ORS 215.213(1) and ORS 215.283(1), the operation of farm stands is not a "farm use"—and, thus, as a matter of law cannot be an "agricultural practice" for purposes of OAR 660-023-0180(4).

As amplified below, we conclude that LUBA's premises are at least partly incorrect. An activity can be an "agricultural practice" for purposes of OAR 660-023-0180(4) even if it is not itself a "farm use" within the meaning of ORS 215.203(2). Further, in a related sense, the listing of ancillary farm-related activities in ORS 215.213(1) and ORS 215.283(1) does not preclude those activities from being deemed, properly, as "agricultural practices" within the purview of OAR 660-023-0180(4).

We return to LUBA's first, perhaps implicit, premise, *viz.,* that "agricultural practices" for purposes of OAR 660-023-0180(4) and "farm use" are, essentially, coextensive. When viewed as a contextual whole, the statutory scheme does not support that equation.

OAR 660-023-0180(4)(b) requires local decisionmakers to "determine existing or approved land uses *within the impact area* that will be adversely affected by proposed mining operations and [to] specify the predicted conflicts." Under that rule, in "determin[ing] whether proposed measures would minimize conflicts to agricultural practices, the requirements of ORS 215.296 shall be followed." OAR 660-023-0180(4)(c).

ORS 215.296, in turn, provides, in part:

"(1) A use allowed under ORS 215.213(2) or 215.283(2)[5] may be approved only where the local governing body or its designee finds that the use will not:

"(a) Force a significant change in accepted farm or forest practices on surrounding lands devoted to farm or forest use; or

"(b) Significantly increase the cost of accepted farm or forest practices on surrounding lands devoted to farm or forest use.

"(2) An applicant for a use allowed under ORS 215.213(2) or 215.283(2) may demonstrate that the standards for approval set forth in subsection (1) of this section will be satisfied through the imposition of conditions."

The conjunction of OAR 660-023-0180(4)(c) and ORS 215.296 is—at least linguistically—somewhat imperfect. While the former refers to conflicts with "agricultural practices," the latter relates to impacts on "accepted farm * * * practices." Nevertheless, nothing in the context or operation of those statutes suggests that those two terms differ in substance.

Oregon's land use statutes do not define either "agricultural practices" or "accepted farm practices." However, ORS 215.203(2)(c) does define the term "accepted farming practice" as follows:

"As used in this subsection, 'accepted farming practice' means a mode of operation that is common to farms of a similar nature, necessary for the operation of such farms to obtain a profit in money, and *customarily utilized in conjunction with farm use.*"

(Emphasis added.) The same subsection also separately defines the term "farm use":

"As used in this section, 'farm use' means the current employment of land for the primary purpose of obtaining a

---

[5] ORS 215.213(2) provides that, in counties that have adopted marginal land provisions, certain listed "uses" may be established in exclusive farm use-zoned areas. ORS 215.283(2) is similar, but not identical, and identifies "nonfarm uses" that, upon approval of the local governing body or its designee, may be established in areas zoned for exclusive farm use.

profit in money by raising, harvesting and selling crops or the feeding, breeding, management and sale of, or the produce of, livestock, poultry, fur-bearing animals or honeybees or for dairying and the sale of dairy products or any other agricultural or horticultural use or animal husbandry or any combination thereof. 'Farm use' includes the preparation, storage and disposal by marketing or otherwise of the products or by-products raised on such land for human or animal use. 'Farm use' also includes the current employment of land for the primary purpose of obtaining a profit in money by stabling or training equines including but not limited to providing riding lessons, training clinics and schooling shows. 'Farm use' also includes the propagation, cultivation, maintenance and harvesting of aquatic species and bird and animal species to the extent allowed by the rules adopted by the State Fish and Wildlife Commission. 'Farm use' includes the on-site construction and maintenance of equipment and facilities used for the activities described in this subsection. 'Farm use' does not include the use of land subject to the provisions of ORS chapter 321, except land used exclusively for growing cultured Christmas trees as defined in subsection (3) of this section or land described in ORS 321.267(1)(e) or 321.415(5)."

Obviously, those two definitions are not dispositive of the content of "agricultural practices" in OAR 660-023-0180(4). By their terms, those definitions apply only within the "subsection" and "section" in which they appear.[6] Nevertheless, as a matter of general context, they are highly instructive in two respects. First, the term "accepted farming practice" is virtually identical to "accepted farm practices" in ORS 215.296—which, as noted, is contextually and functionally the equivalent of "agricultural practices" as used in OAR 660-023-0180(4). Second, the separate definitions in ORS 215.203(2) describe "farm use" and "accepted farming practice" as substantively distinct, albeit related, concepts. In particular, an "accepted farming practice" is a "mode of operation" that, *inter alia*, is "customarily utilized *in conjunction with farm use*." (Emphasis added.)

---

[6] We note, moreover, that the term "accepted farming practice" is not used at all in the current version of the subsection to which it applies, nor was it used in that subsection at the time that ORS 215.296 was enacted. *See* Or Laws 1989, ch 861, § 6 (enacting ORS 215.296); ORS 215.203(2) (1989) (containing definitions of "farm use" and "accepted farming practice").

We perceive no reason why that substantive distinction—albeit not explicitly controlling—should not also extend to the construction and operation of OAR 660-023-0180(4). That is, in context, "agricultural practice" for purposes of OAR 660-023-0180(4) does not connote "farm use" as defined in ORS 215.203(2)(a). Rather, "agricultural practice" has the same meaning as "accepted farming practice," in ORS 215.203(2)(c): a mode of operation, commonly used on similar farms, necessary for profitable operation, and customarily used in conjunction with farm use. In sum, LUBA erred in equating "agricultural practice" with "farm use."

We turn, then, to LUBA's second premise, *viz.*, that all uses listed in ORS 215.213(1) and ORS 215.283(1), including farm stands,[7] are necessarily "nonfarm uses"—and thus, by extension, cannot be "agricultural practices" for purposes of OAR 660-023-0180(4)(c). In support of its statement that uses listed in ORS 215.213(1) and ORS 215.283(1) are "nonfarm uses," LUBA cited our decision in *Collins v. Klamath County*, 148 Or App 515, 941 P2d 559 (1997). In *Collins*, the question presented was whether a stockyard could be operated in an exclusive farm use zone without a conditional use permit. We stated:

"The farm uses that are listed in ORS 215.203 are not replicated in the enumeration of uses in ORS 215.213(1) or ORS 215.283(1), explicitly or implicitly. Indeed, the latter

---

[7] ORS 215.213(1) provides, in part:

"In counties that have adopted marginal land provisions * * * the following uses may be established in any area zoned for exclusive farm use:

"* * * * *

"(u) Farm stands if:

"(A) The structures are designed and used for the sale of farm crops or livestock grown on the farm operation, or grown on the farm operation and other farm operations in the local agricultural area, including the sale of retail incidental items and fee-based activity to promote the sale of farm crops or livestock sold at the farm stand if the annual sale of incidental items and fees from promotional activity do not make up more than 25 percent of the total annual sales of the farm stand; and

"(B) The farm stand does not include structures designed for occupancy as a residence or for activity other than the sale of farm crops or livestock and does not include structures for banquets, public gatherings or public entertainment."

ORS 215.283(1)(r) is identical except, unlike ORS 215.213(1), it does not pertain to counties that have adopted marginal land provisions.

statutes are concerned with *ancillary or nonfarm* uses that are permissible in EFU zones, rather than with farm uses of the kind defined in ORS 215.203."

*Id.* at 521 (emphasis in original). *Collins*, in turn, relied on *Brentmar v. Jackson County*, 321 Or 481, 900 P2d 1030 (1995), for that proposition. *Brentmar* concerned "whether a county may enact and apply legislative criteria of its own that are more restrictive than those found in ORS 215.213 and 215.283, the state statutes pertaining to *permissible farm related and nonfarm uses* in EFU zones." *Id.* at 485 (emphasis added).

The text of ORS 215.213(1) and ORS 215.283(1) corroborates that those statutes do not pertain solely to "nonfarm" uses—that is, that all uses listed in those provisions are not necessarily "nonfarm." For example, while ORS 215.283(2) explicitly states that "the following *nonfarm uses* may be established" (emphasis added), subsection (1) of both ORS 215.213 and ORS 215.283 provides that "the following *uses* may be established in any area zoned for exclusive farm use" (emphasis added). That distinction is borne out by several of the uses listed in subsection (1), which pertain to activities ancillary or related to farm use, including "buildings customarily provided in conjunction with farm use," ORS 215.213(1)(f), ORS 215.283(1)(f); wineries, ORS 215.213(1)(s), ORS 215.283(1)(q); farm stands, ORS 215.213(1)(u), ORS 215.283(1)(r); and certain facilities for the processing of farm crops, ORS 215.213(1)(x), ORS 215.283(1)(u). In short, and contrary to LUBA's "farm use"/"nonfarm use" dichotomy, the inclusion of farm stands among uses permitted pursuant to ORS 215.213(1) and ORS 215.283(1) does not mean that the operation of farm stands cannot be an "agricultural practice" for purposes of the conflicts analysis prescribed by OAR 660-023-0180(4).

■ We thus conclude that LUBA erred in concluding that, as a matter of law, the operation of farm stands cannot be considered an "agricultural practice" for purposes of OAR 660-023-0180(4). We remand this case to LUBA for reconsideration of whether, on this record, the county correctly applied OAR 660-023-0180(4) in evaluating the alleged mining-related impact on the operation of the farm stands here.

Given our disposition of cross-petitioners' assignments of error, we need not reach the issue presented by petitioner concerning the scope of LUBA's remand to the county.

Affirmed on petition of Eugene Sand & Gravel; reversed and remanded for reconsideration on cross-petitions.

Thistledown Farms' motion to dismiss Oregon Concrete and Aggregate Producers Association's petition for judicial review is allowed.